**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Raghavender Mallannagari | **Case No.  09 CV 01352** |
| Plaintiff, | Judge Andersen |
| v. | Magistrate Judge Schenkier |
| GSS America Inc.,<br>GSS America Infotech, Ltd., (newly added)<br>Bhargav Marepally,<br>Ramish Yerramsetti,  (newly added)<br>Parul Patel,<br>Raghu Adlakonda, (newly added)<br>Richard Capalby,<br>Tsvetimira Boeva,<br>Dheeraj ("Raj") Akula, (newly added)<br>Associates Systems LLC (ASL), (newly added)<br>Tilak Chalasani, (newly added)<br>Ces Usa, Inc. (newly added ) | |
| | **Jury Trial Demanded** |
| Defendants. | |

**AMENDED COMPLAINT**

Plaintiff Raghavender Mallannagari ("Plaintiff"), by his counsel, Michael F.

Brown of Peterson, Berk & Cross, S.C. (application for admission filed), Vonda K.

Vandaveer of V.K. Vandaveer, P.L.L.C. (pro hac vice motion forthcoming), and J. Bryan

Wood of The Law Office of J. Bryan Wood, with respect to matters concerning

Defendants GSS America Inc. ("Defendant GSS"), GSS America Infotech, Ltd.

("Defendant GSS India"), Bhargav Marepally, Ramish Yerramsetti, Parul Patel, Raghu

Adlakonda, Richard Capalby, Tsvetimira Boeva, Dheeraj ("Raj") Akula, Associates

Systems LLC (ASL), Tilak Chalasani, and Ces Usa, Inc (collectively, "Defendants"),

alleges as follows:

**INTRODUCTION**

1.      This is an action by Plaintiff pursuant to the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. Sec. 1961, et seq. ("RICO"), provisions of 18 U.S.C. § 1589(3) ["Forced labor"], 18 U.S.C. § 1590 ["Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor"], the Fair Labor Standards Act, 29 U.S.C. 201 et seq. ("FLSA"), and statutory and common law claims under Illinois law.  The damages sought exceed $75,000.

2.      Plaintiff is an H-1B visa (legal non-immigrant) worker, who has advanced college degrees and specialized skills in computer work.

3.      The United States' H-1B visa process is intended to bring talented professional or "specialty" workers to the U.S., to provide labor in areas and jobs where their talents are needed.  Most employers use the H-1B process for this lawful purpose.

4.      However, a sizable minority of H-1B employers within the U.S. use the H-1B process to commit fraud.  Please see attached **Exhibit A,** an H-1B Benefit Fraud & Compliance Assessment conducted in September 2008 by the U.S. Citizenship and Immigration Service (USCIS), which discusses the prevalence of H-1B employer fraud. The government's audited sample of H-1B cases found fraud in 13.4% of its sample cases; this included the types of fraud alleged in this matter, namely immigration document fraud, and fraud involving "benching" and failures to pay required wages (Exhibit A, pp. 8-9).

5.      Some employers abuse the H-1B process to run temporary (temp) employment services.  These fraudulent H-1B temp services are commonly called "body shops."

6. Defendant GSS India and its subsidiary Defendant GSS America—which is the H-1B employer at issue, and which has a publicly-reported estimated annual revenue of $27,100,000— are part of a massive body shop operation conducted within the United States.

7. H-1B body shops obtain H-1B workers and their labor by making false attestations to the U.S. government on labor and immigration documents (namely, on H-1B application documents). The body shops falsely attest that the H-1B applicants will be provided work, and will be paid the wages that are required by H-1B law. After the H-1B workers report to the body shop employer, however, they learn that the employer has no job or wages for them. Rather, the employer directs the H-1B workers to find jobs with third-party employers. Only if and when the H-1B worker obtains work with a suitable third-party, will the worker be paid wages (with the H-1B sponsor employer receiving excess payment/profit from that third party). During those periods an H-1B worker cannot find third-party work—time which H-1B wage law calls "nonproductive" time, and the industry commonly calls "benched" time—the fraudulent body shop does not pay its H-1B workers any wages. The body shop's non-payment for benched time is in knowing violation of H-1B laws plainly referenced in H-1B application documents. A body shop employer who runs the above scheme—along with various third persons/entities who assist that scheme— commit fraud under many federal laws, as described below.

8. Federal law prohibits operation of body shops through, among other laws, RICO. Please see also attached **Exhibit B** a Media Release by the U.S. Department of Justice dated February 12, 2009, which discusses a similar H-1B body shop scheme, and

arrests of several H-1B employer representatives who were involved. The Media Release

at p. 2 states, in pertinent part:

> This investigation involves companies that sponsor primarily H-1B non-immigrants, or temporary workers in specialty occupations that require particular expertise. The companies that are the subject of this investigation have asserted that the foreign workers have been brought to the U.S. to fill existing vacancies. However, the companies allegedly have not always had jobs available for these workers, thereby placing them in non-pay status after they arrive in the United States. In some cases, the foreign workers have allegedly been placed in jobs and locations not previously certified by the Department of Labor, displacing qualified American workers and violating prevailing wage laws. The companies and foreign workers have allegedly submitted false statements and documents in support of their visa petitions. The false statements and documents were mailed or wired to state and federal agencies in support of the visa applications. The companies are suspected of visa fraud, mail fraud, wire fraud, money laundering and conspiracy.

9.      Collectively, Defendants (along with others identified below) work within

an enterprise that has been, dating back to at least 2003, operating a body shop that

utilizes fraudulently-obtained labor from many of its hundreds of workers who are on

H-1B visas.

10.     Defendants, and others involved with the enterprise, share the common

purposes of:

> a.  knowingly falsifying labor and immigration documentation in violation of 18 USC 1546, a statute which is explicitly referenced on H-1B labor and immigration documentation, and is explicitly incorporated by RICO;

> b.  using the false labor and immigration documentation to fraudulently obtain employment and labor from H-1B visa workers; and

    c. profiting by underpaying the H-1B workers—and in many instances, not paying them at all—in knowing violation of labor and immigration wage laws.

11.    The enterprise in which Defendants participate has been knowingly conducting the following scheme:

    a. submitting fraudulent H-1B application documentation with false attestations to the U.S. government for purposes of obtaining H-1B workers' employment for Defendant GSS;

    b. falsely attesting in that labor and immigration documentation that jobs existed for Defendant GSS for H-1B applicant workers, when in fact Defendant GSS knew there were no existing jobs at GSS and knew that the H-1B workers would have to act as temp workers and secure jobs for third-party employers (with Defendants profiting directly or indirectly from monies paid, above and beyond wage monies, by these third party employers);

    c. falsely attesting in the labor and immigration documentation that H-1B applicant workers would be paid by Defendant GSS, as required by labor and immigration law, at a wage that is the higher of the "prevailing wage" or "actual wage" as defined and required by labor and immigration law, when Defendants knew the H-1B workers would not be paid these required wages until if and when they obtained third-party work;

    d. falsely attesting in the labor and immigration documentation that H-1B applicant workers would be paid, as required by labor and

immigration law, for periods of time the workers were not provided projects or work, i.e. falsely attesting the H-1B workers would be paid for nonproductive or "benched" time as required by 20 CFR 655.731(c)(7), 8 U.S.C. §1182(t)(3)(C)(vii)(I) and 8 U.S.C. §1182(t)(1)(A), when Defendants knew H-1B workers would not be paid for this benched time;

e.  not paying H-1B workers their full prevailing wage or actual wage during periods of work on projects as required by labor and immigration law;

f.  not paying H-1B workers the prevailing wage or actual wage for their benched time as required by labor and immigration law;

g.  providing phony work leave request documents to benched H-1B workers, and asking they sign the documents to create documentation falsely indicating that the H-1B workers were not benched (i.e. were not in nonproductive status due to the employer's acts) but had voluntarily decided not to perform work and not to earn wages—the enterprise used these phony leave requests in an effort to conceal their fraudulent and unlawful conduct;

h.  maintaining the H-1B workers as captive and forced workers, given that (due to immigration law requirements) H-1B workers could only work for Defendant GSS and could not transfer to a different employer because they lacked, as required by USCIS procedures for

6

H-1B transfers, payments and paystubs from Defendant proving they received the prevailing or actual wage;

i. housing H-1B workers in a guest house maintained by Defendant GSS, thereby increasing the H-1B workers' dependence on, and control under, GSS;

j. concealing and destroying immigration-related documentation which evidences the foregoing labor and immigration documentation fraud and unpaid wage fraud, in preparation for an audit by the U.S. Department of Labor (DOL) related to an H-1B worker's wage complaint;

k. presenting to a DOL investigator with documentation that was incomplete and misleading, and withholding or otherwise concealing or destroying evidence of the foregoing labor and immigration documentation fraud and unpaid wage fraud;

l. firing employees of Defendant GSS who complained about the unlawful and fraudulent conduct, including the concealment and destruction of documents relating to DOL's audit; and

m. failing to pay Plaintiff his underpaid wages and continuing to underpay other H-1B workers after Defendants received explicit notice of labor and immigration wage law requirements (namely, prevailing wage and benched pay requirements), explicit notice of Defendants' ongoing and systemic violations of applicable labor and immigration wage law, and explicit notice of Defendants' ongoing

and systemic civil violations of labor and immigration document fraud laws, forced labor laws, and trafficking laws.

12.     Defendants' pattern of fraudulent and unlawful conduct caused direct economic harm to Plaintiff and to other similarly situated individuals.[1]

## JURISDICTION AND VENUE

13.     Jurisdiction over Plaintiff's RICO claims is conferred upon this Court pursuant to 18 U.S.C. § 1964.

14.     Jurisdiction over Plaintiff's claims under 18 U.S.C. § 1589(3) ["Forced labor"] and 18 U.S.C. § 1590 ["Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor"] is conferred upon this Court pursuant to 18 U.S.C. § 1595(a).

15.     Jurisdiction over Plaintiff's Fair Labor Standards Act claim, 29 U.S.C. 201 *et seq.*, is conferred upon this Court pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

16.     Jurisdiction over Plaintiff's claims under Illinois statutory and common law is conferred upon this Court pursuant to 28 U.S.C. § 1367.

17.     Venue in the United States District Court for the Northern District of Illinois is appropriate under 28 U.S.C. § 1391 (a) and (b), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Illinois.

18.     Relief is sought against Defendants as well as their employees, agents, assistants, and successors.

---

[1]  This footnote is not a factual allegation to which Defendants must respond.  Plaintiff is investigating whether to pursue his claims on behalf of other similarly situated individuals who were harmed by Defendants' pattern of unlawful and fraudulent conduct.  If Plaintiff intends to pursue his claims on a representative basis, he will seek leave to amend his complaint to specifically allege claims on behalf of himself and others similarly situated to him.

## PARTIES

19.     Plaintiff Raghavender Mallannagari ("Plaintiff"), at times material to the instant complaint, resided and worked in Illinois.

20.     Defendant GSS America Inc. ("Defendant GSS") was incorporated under Illinois law, and has its principal place of business at 1699 Wall St., Suite 201, Mt. Prospect, Illinois.  Defendant GSS, a business involved with computers and software, is an employer which employed Plaintiff, and agreed to provide him work in or near Mt. Prospect, IL.  At all times pertinent to this litigation, Defendant GSS has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

21.     Defendant GSS America Infotech, Ltd. ("Defendant GSS India"),   is incorporated under India law, has its principal place of business in India, and is registered to do business in Illinois.  At all times pertinent to this litigation, Defendant GSS India has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

22.     Defendant Bhargav Marepally ("Defendant Marepally"), at all times material to this cause of action, was an adult resident of Illinois, was the Chief Executive Officer of Defendant GSS, and exercised significant financial and operational control with regard to Defendant GSS's business and employment matters.  At all times pertinent to this litigation, Defendant Marepally has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

23.     Defendant Ramish Yerramsetti ("Defendant Yerramsetti") was, at all times material to this cause of action, an adult resident of Illinois, was the Chief Operating

Officer or was otherwise an executive or binding representative of Defendant GSS, and/or exercised significant financial and operational control with regard to Defendant GSS's business and/or employment matters. At all times pertinent to this litigation, Defendant Yerramsetti has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

24.     Defendant Parul Patel ("Defendant Patel") was, at all times material to this cause of action, an adult resident of Illinois, was a Director or was otherwise an executive or binding representative of Defendant GSS, and/or exercised significant financial and operational control with regard to Defendant GSS's business and/or employment matters. At all times pertinent to this litigation, Defendant Patel has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

25.     Defendant Tsvetimira Boeva ("Defendant Boeva") was, at all times material to this cause of action, an adult resident of Illinois, was an immigration specialist or was otherwise an executive or binding representative of Defendant GSS, and/or exercised significant financial and operational control with regard to Defendant GSS's business and/or employment matters. At all times pertinent to this litigation, Defendant Boeva has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

26.      Defendant Richard Capalby ("Defendant Capalby") was, at all times material to this cause of action, an adult resident of Illinois, was an in-house attorney and thereafter a Vice President of Corporate Affairs or was otherwise an executive or binding representative of Defendant GSS, and/or exercised significant financial and operational control with regard to Defendant GSS's business and/or employment matters. At all times

pertinent to this litigation, Defendant Capalby has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

27.    Defendant Raghu Adlakonda ("Defendant Adlakonda") was, at all times material to this cause of action, an adult resident of Illinois, was a Director or was otherwise an executive or binding representative of Defendant GSS, and/or exercised significant financial and operational control with regard to Defendant GSS's business and/or employment matters.  At all times pertinent to this litigation, Defendant Adlakonda has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

28.    Defendant Dheeraj ("Raj") Akula ("Defendant Akula") was, at all times material to this cause of action, an adult resident of Texas, was an owner of Associates Systems LLC (ASL), and provided consulting services to Defendant GSS (for which he and/or Defendant Associates Systems LLC was compensated) which related to one or more H-1B wage audits by DOL.  At all times pertinent to this litigation, Defendant Akula has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

29.    Defendant Associates Systems LLC ("Defendant ASL") was, at all times material to this cause of action, incorporated under New Jersey law, has a principal place of business at 1303 W Walnut Hill Lane, Suite 235, Irving, TX 75038, and provided consulting services to Defendant GSS (for which it and/or Defendant Akula was compensated) which related to one or more H-1B wage audits by DOL.  At all times pertinent to this litigation, Defendant ASL has been employed by or associated with an

enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

30.     Defendant Tilak Chalasani ("Defendant Chalasani") was, at all times material to this cause of action, an adult resident of Illinois, was an accountant at Computech Enterprise Solutions, Ltd. a/k/a Ces Usa, Inc. and Ces International Inc., and provided consulting services to Defendant GSS (for which he and/or Computech Enterprise Solutions, Ltd. was compensated) which related to one or more H-1B wage audits by DOL.  At all times pertinent to this litigation, Defendant Chalasani has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

31.     Defendant Ces Usa, Inc., a/k/a Computech Enterprise Solutions, Ltd. a/k/a Ces International Inc. ("Defendant CES") was, at all times material to this cause of action, incorporated under Illinois law, has a principal place of business at 2625 Butterfield Road, Suite 300s, Oak Brook, IL 60523, and provided consulting services to Defendant GSS (for which it and/or Defendant Chalasani was compensated) which related to one or more H-1B wage audits by DOL.  At all times pertinent to this litigation, Defendant CES has been employed by or associated with an enterprise that has been engaged in, and has been conducting activities that affect, interstate and foreign commerce.

## FACTS

### H-1B Visas; H-1B Workers' Dependence on Defendant GSS

32.     A foreign worker may lawfully obtain an H-1B visa only if the worker works in a recognized "specialty" occupation.

33.     A foreign worker who obtains an H-1B visa may only be employed with the U.S. employer who sponsors the visa.  If the employee loses the employment with the H-

1B sponsor employer, then the employee loses status to lawfully remain in the U.S. Because of this circumstance, an H-1B employer exercises substantial control over the H-1B employee's employment and presence in the U.S.

34.    By not paying H-1B workers their required wages, Defendant GSS maintained H-1B workers as captive and forced workers, given that (due to immigration law requirements) the workers could only work for Defendant GSS and could not transfer to a different employer because they lacked, as required USCIS procedures for an H-1B transfer to a new sponsor employer, payments and paystubs from Defendant GSS proving the workers received the prevailing or actual wage.

35.    Defendant GSS further exercised leverage and control over its H-1B employees insofar as Defendant GSS by providing housing at which H-1B employees lived, and H-1B employees were financially dependant on this housing.

**Plaintiff's Background**

36.    Plaintiff is a citizen of India.

37.    Prior to beginning employment with Defendants, Plaintiff obtained a Computer Science and Engineering degree in India, and he received a Masters degree in Business Administration at Southern New Hampshire University. Defendant GSS considered Plaintiff a desirable employee because he obtained these specialty degrees.

**Offer Letter from Defendant GSS to Plaintiff;**
**False Statements About Wages**

38.    Prior to Plaintiff starting employment, Defendant GSS's employee representative Shyamu Badugu wrote Plaintiff a letter dated October 9th, 2007. The letter stated Defendant GSS was "offer[ing] … [Plaintiff] a full-time position with GSS America Inc. as a Programmer / Analyst… [and his] starting salary will be $60,000/-

13

per year ... [and he] will be entitled to receive health / dental benefits and life and long-term disability insurance coverage as are generally available from time to time to similarly situated employees of the Company." A copy of the October 9, 2007 letter is attached hereto as **Exhibit C**. In sending this letter, Mr. Badugu was acting on behaf of Defendant GSS.

39. This offer letter from Shyamu Badugu and Defendant GSS did not state that Defendant GSS would be acting as a temp service, and did not state that Plaintiff's receipt of wages would be contingent on Plaintiff obtaining work with a third-party employer.

40. Defendant GSS's representative Mr. Badugu had knowledge that Plaintiff would not be paid at the October 9, 2007 letter's stated $60,000 wage (and that he would not be paid any wage) for any period of "benched" time during which Plaintiff was sending out resumes or was otherwise not working for a third-party employer.

41. Defendant GSS, Defendant GSS India, Defendant Marepally, Defendant Yerramsetti, Defendant Patel, Defendant Boeva, Defendant Capalby, and Defendant Adlakonda had knowledge that H-1B applicants would not be paid at their offer letters' stated wage (and that they would not be paid any wage) for any periods of "benched" time during which the H-1B workers were sending out resumes or were otherwise not working for a third-party employer. Defendant GSS, Defendant GSS India, Defendant Marepally, Defendant Yerramsetti, Defendant Patel, Defendant Boeva, Defendant Capalby, and Defendant Adlakonda had knowledge that Plaintiff would not be paid at the October 9, 2007 letter's stated $60,000 wage (and that he would not be paid any wage) for any period of "benched" time during which Plaintiff was sending out resumes or was otherwise not working for a third-party employer.

**Labor and immigration Documentation: Knowingly False Statements/Attestations By Defendant GSS and Other Defendants About Required Wages**

42. Plaintiff's employment with Defendant GSS was contingent upon the U.S. government's approval of an H-1B visa petition that Defendant GSS submitted to USCIS, and a Labor Condition Application (LCA) that Defendant GSS submitted to the DOL, on Plaintiff's behalf.

43. A copy of the LCA that Defendant GSS submitted to USCIS is attached hereto as **Exhibit D**.

44. Defendant Patel and/or another representative of Defendant GSS submitted the LCA to DOL on or about October 26, 2007.

45. Defendant Capalby was listed as a "Contact" on the LCA (Exhibit D, p. 6).

46. Defendant Capalby knew he was listed as a "Contact" on Plaintiff's LCA that was submitted to DOL on or about October 26, 2007 (Exhibit D) and was aware of the contents of LCAs through his roles as in-house counsel and Vice President for Defendant GSS.

47. Defendant Patel reviewed and signed the LCA on October 26, 2007.

48. Directly to the right of Defendant Patel's signature dated 10/26/2007, the LCA form states:

> *Making fraudulent representations on this Form can lead to civil or criminal **action under** 18 U.S.C. 1001, **18 U.S.C. 1546, or other provisions of law**.* (emphasis added).

49. One of these statutes cited by the LCA, 18 U.S.C. 1546, states, in pertinent part, that this statute is violated when a party:

> *... knowingly ... falsely makes any immigrant or nonimmigrant visa... or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States... knowing it to be ... falsely made, or to have been procured by means of any false claim*

> *or statement, or to have been otherwise procured by fraud or unlawfully obtained.* 18 U.S.C. 1546(a). (emphasis added).

50.     RICO law at 18 U.S.C.A. § 1961(1)(B) explicitly incorporates by reference 18 U.S.C. 1546, and violations of 18 U.S.C. 1546 (including knowingly false statements on LCAs and other labor and immigration documents) are "racketeering activities" and violations of RICO fraud law.

51.     On the LCA, a few inches above Defendant Patel's signature dated October 26, 2007, the LCA states:

> *By signing this form,* **I, on behalf of the employer, attest that the information and labor condition statements provided are true and accurate**; *that* **I have read the Sections E and F of the cover pages (Form ETA 9035CP), and that I agree to comply with the Labor Condition Statements as set forth in the cover pages and with the Department of Labor Regulations (20 CFR part 655, Subparts H and I)**. *I agree to make this application, supporting documentation, and other records, available to officials of the Department of Labor upon request during any investigation under the Immigration and Nationality Act.* (emphasis added).

52.     The aforementioned Section E of the cover pages (Form ETA 9035CP) states, in material part, the following:

> *1. Wages:* **The employer attests that H-1B nonimmigrants will be paid wages which are at least the higher of the actual wage** *level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question* **or the prevailing wage** *level for the occupational classification in the area of intended employment.* **By marking "Yes" in section E of the Labor Condition Application for H-1B nonimmigrants (Form ETA 9035), the employer also attests that it will pay H-1B nonimmigrants the required wage for time spent in nonproductive status due to a decision of the employer..."* (emphasis added).

53.     Defendant Patel's October 26, 2007 signature of the LCA indicated her attestation that Defendant GSS would pay Plaintiff the "actual wage" or "prevailing wage" as required per labor and immigration wage laws under 20 CFR part 655, which laws were referenced by the LCA.

54.    Under labor and immigration laws, Defendant GSS was required to pay Plaintiff the "actual wage" of $60,000 stated on his LCA.

55.    In signing the LCA on October 26, 2007, Defendant Patel had knowledge the foregoing LCA attestations— that Plaintiff was to be paid the required "prevailing wage" or "actual wage," and that Plaintiff was to be paid the required wage during "nonproductive" time as required by labor and immigration wage law (i.e. time during which Plaintiff did not work because no work was available via Defendant GSS, which non-productive time is commonly called "benched" time)— were false.

56.    Defendant Capalby also had knowledge the foregoing attestations on the LCA submitted on or about October 26, 2007—i.e. that Plaintiff was to be paid the required "prevailing wage" or "actual wage," and that Plaintiff was to be paid the required wage during "nonproductive" or benched time as required by labor and immigration wage laws— were false.

57.    Defendant GSS, Defendant GSS India, Defendant Marepally, Defendant Yerramsetti, Defendant Patel, Defendant Boeva, Defendant Capalby, and Defendant Adlakonda also had knowledge the foregoing attestations on the LCA submitted on or about October 26, 2007—i.e. that Plaintiff was to be paid the required "prevailing wage" or "actual wage," and that Plaintiff was to be paid the required wage during "nonproductive" or benched time as required by labor and immigration wage law— were false.

58.    In signing the LCA on October 26, 2007, Defendant Patel had knowledge that Plaintiff would *not* in fact be paid *any* wage by Defendant GSS: (a) for the initial period of time Plaintiff was to spend sending resumes and trying to find his first third-party employer; and (b) for periods of time between third-party work assignments or

any other periods during which Plaintiff would not be performing specialty computer work, i.e. any periods when he would be in nonproductive or "benched" status.

59.     At the time the LCA was submitted on or about October 26, 2007, Defendant Capalby had knowledge that Plaintiff would *not* in fact be paid *any* wage by Defendant GSS: (a) for the initial period of time Plaintiff was to spend sending resumes and trying to find his first third-party employer; and (b) for periods of time between third-party work assignments or any other periods during which Plaintiff would not be performing specialty computer work, i.e. any periods when he would be in nonproductive or "benched" status.

60.     At the time the LCA was submitted on or about 10/26/2007, Defendant GSS, Defendant GSS India, Defendant Marepally, Defendant Yerramsetti, Defendant Patel, Defendant Boeva, Defendant Capalby, and Defendant Adlakonda had knowledge that Plaintiff would *not* in fact be paid *any* wage by Defendant GSS: (a) for the initial period of time Plaintiff was to spend sending resumes and trying to find his first third-party employer; and (b) for periods of time between third-party work assignments or any other periods during which Plaintiff would not be performing specialty computer work, i.e. any periods when he would be in nonproductive or "benched" status.

61.     When the H-1B and LCA application documents were completed and submitted by Defendant GSS on or about October 26, 2007, Defendant GSS, Defendant GSS India, Defendant Marepally, Defendant Yerramsetti, Defendant Patel, Defendant Boeva, Defendant Capalby, and Defendant Adlakonda knew the "Programmer / Analyst" position and work for Defendant GSS referenced on the LCA did not exist, and knew Defendant GSS did not have work available for Plaintiff.

62.     According to government records between the years 2004-2007, Defendant GSS had obtained LCAs (to employ H-1B employees) for:

      a.   231 H-1B employees for fiscal year 2008;

      b.   148 H-1B employees for fiscal year 2007;

      c.   143 H-1B employees for fiscal year 2006;

      d.   105 H-1B employees for fiscal year 2005; and

      e.   141 H-1B employees for fiscal year 2004.

63.     With regard to most or all of these H-1B employees employed by Defendant GSS since 2004 –for whom LCAs were secured dating back to October 2003— Defendants GSS, Patel and/or Capalby (or other representatives working in similar capacities for Defendant GSS at relevant times) made and submitted false attestations about required wages, of the kind detailed above, in most or all of these workers' LCAs.

64.     The knowingly false attestations about required wages made and submitted by Defendants GSS, Patel and Capalby (or other representatives working in similar capacities for Defendant GSS at relevant times) as referenced above, which were contained within many H-1B workers' LCAs (including the knowingly false attestations about required wages made and submitted by Defendants GSS, Patel and Capalby in Plaintiff's October 2007 LCA as detailed above), were in violation of the provisions of 18 U.S.C. 1546, the civil and criminal immigration document fraud statute that is explicitly referenced by the LCA forms, and explicitly incorporated by RICO.  The false attestations were performed under the specific direction and knowledge of Defendant GSS, Defendant GSS India, Defendant Marepally, Defendant Yerramsetti, Defendant Patel, Defendant Boeva, Defendant Capalby, and Defendant Adlakonda.

**Plaintiff's Reliance on False Representations**

65.    DOL approved the LCA that had been submitted for Plaintiff on or about October 26, 2007.

66.    Defendant GSS did not provide Plaintiff with a copy of his LCA until after Plaintiff obtained legal counsel, and after Plaintiff's legal counsel contacted Defendant GSS in January 2009.

67.    On several occasions during Plaintiff's employment with Defendant GSS, he asked Defendant GSS (including, via requests made to Defendant Boeva in February 2008) to provide him with labor and immigration documentation). Defendant GSS did not provide the labor and immigration documentation at that time.

68.    Plaintiff relied on the representations in the offer letter (also stated in the LCA)—that he would be provided work as a Programmer/Analyst, and would be paid a salary of $60,000—in agreeing to be employed by Defendant GSS and allowing that entity to sponsor and control his H-1B visa and his status in the U.S.

69.    Had Plaintiff been informed in advance that he would be benched and would not be paid for benched periods, he would not have agreed to be employed by Defendant GSS or have his H-1B visa status bound to Defendant GSS.

70.    Had Plaintiff been employed by an employer other than Defendant GSS who followed labor and immigration law requirements, Plaintiff would have been paid his full required wages (prevailing or actual wage, for productive and/or nonproductive time) during employment for such an employer.

**Employment With Defendant GSS: Defendant GSS's Knowing Failure to Pay Plaintiff and Other H-1B Workers Their Wages (Prevailing or Actual Wages, Including Wages for Benched/Nonproductive Time) As Required By Labor and immigration Law**

71.     Plaintiff made himself available to start work for Defendant GSS as an H-1B employee on or about January 8, 2008.

72.     When Plaintiff reported to work for Defendant GSS, he learned the "Programmer / Analyst" position Defendant GSS referenced in the LCA and offer letter did not exist, and that Defendant GSS did not have any job or work available for Plaintiff.

73.     Rather, Defendant GSS intended a temp worker arrangement in which Plaintiff's services would be marketed, with the intent that he obtain and perform labor for third parties.

74.     Defendant GSS, via specific direction from employees Balakrishna Raju, Rajitha Muddala, Defendant Patel and others, required Plaintiff to come to Defendant GSS's office every business day from 9:00a.m to 5:00pm, so that Defendant GSS could market his resume.  Per Defendant GSS's directives, Plaintiff reported for work daily, and performed job-search-related tasks (e.g. worked on his resume, researched job openings, submitted applications to third-party employers, etc.).

75.     Between January 2008 and July 2008, Defendant Capalby routinely observed Plaintiff and other H-1B workers at the office, and knew the workers were on nonproductive/benched status and were not being paid their required wages.

76.     From January 2008 until July 2008, employees of Defendant GSS and Defendant GSS India directed Plaintiff to send out resumes and otherwise market himself to third parties for work.  For specific example:

    a.  On Wednesday, February 13, 2008, Balakrishna Raju, who resides in India and, is an employee of Defendant GSS and Defendant GSS India, emailed Plaintiff and indicated he had reviewed Plaintiff's resumes and provided Plaintiff suggestions to get a work project for a third-party employer; and

    b.  On Thursday, July 10, 2008, Plaintiff emailed Defendant GSS employee Rajitha Muddala and indicated that Plaintiff was preparing for an SAS certification exam, a training measure that Plaintiff had pursued under the direction of Defendant Patel in order to improve Plaintiff's computer skills and improve his chances for obtaining work with a third party.

77.    Despite Plaintiff's efforts to obtain work for a third-party employer, undertaken per the directives of Defendant GSS's employees, he did not obtain such work.

78.    Plaintiff was in benched/nonproductive status for the full duration of his employment with Defendant GSS, which lasted from January 8, 2008 to October 31, 2008.

79.    Defendant GSS never paid any wages to Plaintiff.

80.    Defendant GSS never provided any benefits to Plaintiff.

81.    Defendant GSS failed to provide Plaintiff with benefits on the same basis, and in accordance with the same criteria, as Defendant GSS offered to U.S. citizen workers.

82.    Payroll employees who worked for Defendant GSS did not deliver payroll checks cut by Automated Data Processing, Inc. ("ADP") (a third party that administered

Defendant GSS's payroll) or otherwise deliver required wages to Plaintiff or to other H-1B employees for time during payroll periods between at least January 2008 and present, during which said H-1B employees were benched/nonproductive.

83.     Payroll employees who worked for Defendant GSS did not deliver payroll checks cut by ADP or otherwise deliver required wages to other H-1B employees for time during payroll periods between at least January 2004 and present, during which said H-1B employees were benched/nonproductive.

84.     Defendant GSS's failures to pay Plaintiff and other H-1B workers their required wages were conducted under the directives of Defendant GSS, Sirish Ganti (an employee of Defendant GSS working under the knowing directives of Defendant Adlakonda), and ultimately under the knowing directives of Defendant Adlakonda, Defendant Patel, Defendant Capalby, Defendant Marepally, Defendant Yerramsetti, Defendant GSS and Defendant GSS India.

85.     The elaborate payroll fraud conducted by Defendants and others are detailed in a lawsuit filed by Pragati Pinto, who was a former payroll employee of Defendant GSS.  See, *Pinto v. GSS America, Inc.,, et. al.*, No. 09-CV-2966 (N.D. Ill. filed May 15, 2009),  Ms. Pinto's Complaint correctly alleges the following at pars. 35-47:

> a.  GSS America's [Defendant GSS's] payroll was administered by a company called Automated Data Processing, Inc. ("ADP").
>
> b.  Each pay period, GSS America sent ADP the information needed to prepare the payroll checks for GSS America employees.
>
> c.  GSS America wired funds to ADP to cover the payroll checks' face value, taxes and other withholdings, and ADP's administrative fees.

d.  ADP would then issue the payroll checks and send them to GSS America for distribution. Ms. Pinto would typically distribute the paychecks.

e.  Each payroll period, a GSS America employee named Sirish Ganti, working on the instructions of GSS America Director Raghu Adlakonda, sent an e-mail to Ms. Pinto instructing her not to distribute payroll checks to certain consultant-employees. Ms. Pinto was instructed to instead store the payroll checks.

f.  Ms. Pinto followed her employer's instructions.

g.  Over time, Ms. Pinto began to wonder why her superiors were asking her to withhold payroll checks from some consultant-employees.

h.  Ms. Pinto began to worry that GSS America was generating payroll checks that it was delaying and/or had no intention of providing to employees in order to create a misleading paper trail.

i.  If an employee does not cash the check before its 180 day expiration date, ADP refunds the amount of the check to GSS America.

j.  Accordingly, there would be a record of a check having been issued and it would appear that an employee had been paid even though the employee would not have actually received the funds.

k.  Ms. Pinto pleaded with GSS America management and Human Resources in India to allow her to give employees their checks. Most of the time, GSS America refused Ms. Pinto's requests.

l. In spite of Ms. Pinto's complaints, GSS America continued to instruct her to store the paychecks of certain consultant-employees.

m. Ms. Pinto also complained to GSS America's in-house legal counsel, who told her that the consultant-employees had agreed to delay payment of their paychecks.

86. The above payroll scam, as correctly described by Ms. Pinto, served to deprive facilitate the non-payment of legally-required wages to workers. H-1B workers were underpaid as part of this scam, or the scam was related to or facilitated documentation cover-ups and frauds relating to H-1B workers.

87. The specified Defendants' directives and failures to provide Plaintiff his actual wage of $60,000 and other H-1B workers their required wages for the pay periods between January 8, 2008 and October 31, 2008 were in explicit and knowing violation of H-1B labor and immigration wage law under 20 CFR 655.731 (also referenced by the LCA) which requires payment of the required wage, and requires payment of the required wage for nonproductive (benched) time.

88. Defendant GSS's failures to pay Plaintiff his actual wage of $60,000 for the pay periods between January 8, 2008 and October 31, 2008 were in knowing relation to, and furtherance of, the knowingly false and fraudulent LCA attestations about required wages, detailed above, which violated immigration document fraud provisions of 18 U.S.C. 1546.

89. Most or all of the referenced H-1B workers above for whom LCAs were secured from October 2003 through October 2007, were also not issued payroll checks or paid required wages for those payroll periods between at least January 2004 and

present, during which said H-1B employees were on benched/nonproductive periods between January 2004 and the present date.

90.     When Plaintiff worked at Defendant GSS's office on a regular basis (between January 2008 and July 2008), he talked to Defendant Patel about once a month, on average, about problems.   On several occasions, Plaintiff complained to Defendant Patel that there was a lack of project work, and that Defendant GSS had not been paying Plaintiff and others.  Defendant Patel on several occasions stated that Defendant GSS would help Plaintiff and other H-1B employees with these problems, but Defendant GSS never rectified Plaintiff's lack of work and lack of wages.

91.     During a specific instance in July 2008, Plaintiff complained to Defendant GSS's employee representative Shyamu Badugu about the fact he was not being paid. Mr. Badugu threatened Plaintiff that if he filed a legal complaint to pursue his unpaid wages, Defendant GSS would terminate his employment and inform government immigration officials that he was terminated.

92.     Defendant GSS alleges that Defendant GSS revoked Plaintiff's H-1B visa on August 13, 2008.

93.     After Defendants failed to pay Plaintiff any wages for several months, Plaintiff sought new employment.

94.     Plaintiff filed for an H-1B transfer to start work with a new employer, and his transfer was lawfully approved by USCIS.  Because Plaintiff lacked the paystubs normally required by USCIS to extend H-1B status, he had to argue a legal exception ("extraordinary circumstances" as defined by 8 CFR §214.1(c)(4).) in order to obtain the approval for the new H-1B employer from the U.S. government.

95.     Plaintiff started a new job with a new H-1B employer on or about November 1, 2008.

96.     Although Plaintiff maintained an employment relationship with Defendant GSS from January 8, 2008 to October 31, 2008, Defendant GSS did not pay Plaintiff any wages during this time.  Defendant GSS thus failed to pay Plaintiff at the actual wage as is required by labor law at 20 CFR Subparts H and I, which law is referenced in Plaintiff's LCA.

97.     Defendant GSS's failures to pay Plaintiff the required wage violated applicable labor and immigration and labor laws at 20 C.F.R. § 655.731(a)(3), 20 C.F.R. § 655.731(c)(1),(c)(5), and (c)(7), 8 U.S.C. § 1182 (n)(1)(A)(i)(II),  8 U.S.C. § 1182 (p)(3), 8 U.S.C. § 1182(t)(1)(A)(i)(II), and 8 U.S.C. § 1182(t)(3)(C)(vii)(I).

98.     Defendant GSS's failure to pay Plaintiff while he was not working in a specialty occupation (i.e. when he was "benched" or in nonproductive status due to Defendants' decisions) violated labor and immigration law at 20 CFR 655.731(c)(7), 8 U.S.C. §1182(t)(3)(C)(vii)(I) and 8 U.S.C. §1182(t)(1)(A) requiring that H-1B workers be paid during such a nonproductive period.

99.     Defendant GSS's failure to pay Plaintiff also violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.*, the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*, and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

**August 2008 DOL Wage Complaint, September 2008 DOL Audit, Document Concealment and Destruction**

100.    Defendant GSS was subject to at least two DOL wage complaints. Defendant GSS was subject to audit by DOL beginning in approximately July 2008,

according to the true and correct allegations of its former employee Ms. Pinto in her above-referenced lawsuit.

101.    Ms. Pinto's Complaint correctly alleges the following at pars. 48-64:

a.  GSS America management held a meeting of all employees in early August 2008.

b.  At the August 2008 meeting, GSS America management announced that the Department of Labor planned to audit GSS America's records on September 4, 2008.

c.  GSS America management informed the staff that for the next month, all regular work would cease so that employees could help "prepare" for the audit.

d.  At that August 2008 meeting, [Ms. Pinto] publicly stated that she would cooperate fully with any investigation by the Department of Labor or anyone else who wanted to see the records she maintained.

e.   Shortly after Ms. Pinto stated that she would fully cooperate with the investigation, GSS asked each and every one of its employees – except Ms. Pinto – to help "prepare" for the Department of Labor audit.

f.  On information and belief, as a part of the company's "preparation" for the Department of Labor audit, GSS America management destroyed, altered and/or instructed employees to destroy and/or

alter a large volume of company documents relevant to the Department of Labor's inquiry.

g.  For example, Finance Manager Sanjeev Patri told Ms. Pinto that he needed to borrow her shredder.

h.  Mr. Patri told her he needed the shredder to destroy documents related to employee's labor and immigration paperwork.

i.  Mr. Patri brought the shredder into Room 14, where labor and immigration documents, payroll records and other files were kept.

j.  In the days following, Ms. Pinto had reason to be in Room 14 and saw piles of labor and immigration documents sitting next to the shredder.

k.  She never witnessed shredding during work hours but each day, the piles of labor and immigration documents that had been sitting next to the shredder the night before would be gone.

l.  In addition, upon information and belief, a GSS America in-house attorney, Tsvetimira Boeva, was either forced to quit or was terminated because she refused to cooperate with management's "preparation" for the DOL audit.

m.  Also, GSS America instructed consultant-employees to prepare back-dated vacation requests for the periods that they did not receive pay.

n.  Ms. Pinto was not allowed to speak to the Department of Labor investigator when he came to the office in September 2008, even though she worked on some parts of the company's accounting

books and distributed the payroll checks to employees, including the consultant-employees.

o. Ms. Pinto repeatedly attempted to meet with the DOL investigator, who was working in a certain location in the GSS America office. However, every time she would try to come up with a pretense for heading in that direction, an employee would overtly follow her to ensure that she would not talk to him. On information and belief, Ms. Pinto's co-workers were monitoring her behavior on instructions from management.

p. Shortly after Ms. Pinto stated that she would fully cooperate with the auditors' investigation, she was removed from an internal e-mail distribution list and thereby excluded from many internal communications.

q. Additionally, GSS America instructed its office personnel to monitor Ms. Pinto's conversations, telephone and e-mail conversations, and comings and goings in the office.

**The Involvement of Defendant Akula, Defendant ASL, Defendant Chalasani, Defendant CES, and Others in the September 2008 DOL Audit, Document Concealment and Destruction**

102.  As of the time of DOL's involvement with and auditing of Defendant GSS in August and September 2008:

a. Defendant Akula was an owner of Defendant Associates Systems LLC (ASL);

b. Defendant Akula provided consulting services to Defendant GSS (for which he and/or Defendant Associates Systems LLC was

compensated) which related to one or more H-1B wage audits by DOL, including DOL's involvement with and auditing of Defendant GSS in August and September 2008;

c.  Defendant Akula was selected by Defendant GSS for consulting services because of his prior experiences helping H-1B employers prepare for DOL audits.

d.  Defendant Akula was recognized as valuable, by Defendant GSS and by Defendant Marepally, because he was part of a husband and wife team along with his wife, Kavitha Akula. Kavitha Akula is a partner and owners of the law firm Akula & Associates. The law firm of Akula & Associates has provided and continues to provide legal advice to Defendant GSS with respect to H-1B employment issues.

e.  Defendant Akula was directed, by Defendant GSS, Defendant Marepally, Defendant Yerramsetti, Defendant Patel and others, to participate in activities that directly or indirectly concerned the concealing and destruction of labor and immigration law documents and information that related to DOL inquiries of Defendant GSS that occurred during August and September 2008.

f.  Defendant Akula directed employees of Defendant GSS to participate in activities that directly or indirectly concerned the concealing and destruction of labor and immigration law documents and information that related to DOL inquiries of Defendant GSS that occurred during August and September 2008.

g.  Defendant Akula was compensated for his aforementioned consulting services by Defendant GSS.

103.    As of the time of DOL's involvement with and auditing of Defendant GSS in August and September 2008:

a.  Defendant Tilak Chalasani was an account or representative of Defendant Computech Enterprise Solutions, Ltd. a/k/a Ces Usa, Inc. and Ces International Inc;

b.  Defendant Chalasani provided consulting services to Defendant GSS (for which he and/or Defendant CES was compensated) which related to one or more H-1B wage audits by DOL, including DOL's involvement with and auditing of Defendant GSS in August and September 2008;

c.  Defendant Chalasani was directed, by Defendant GSS, Defendant Marepally, Defendant Yerramsetti, Defendant Patel and others, to participate in activities that directly or indirectly concerned the concealing and destruction of labor and immigration law documents and information that related to DOL inquiries of Defendant GSS that occurred during August and September 2008.

d.  Defendant Chalasani directed employees of Defendant GSS to participate in activities that  directly or indirectly concerned the concealing and destruction of labor and immigration law documents and information that related to DOL inquiries of Defendant GSS that occurred during August and September 2008.

    e.  Defendant Chalasani was compensated for his aforementioned consulting services by Defendant GSS.

104.    Defendant GSS obtained legal advice from a law firm, The Chugh Firm, including its attorney Inderpreet Sawhney, at the time of DOL's involvement with and auditing of Defendant GSS in August and September 2008. The Chugh Firm was recognized as valuable by Defendant GSS because of the firm's experience in assisting H-1B employers with DOL audits. The Chugh Firm provided legal advice and directives to Defendant GSS at the time its employees participated in activities that directly or indirectly concerned the concealing and destruction of labor and immigration law documents and information that related to DOL inquiries of Defendant GSS that occurred during August and September 2008. The Chugh Firm was compensated for its aforementioned legal advice and directives to Defendant GSS.

## October 2008-January 2009 Internal Complaints by H-1B Worker Apoorva Siddaramaiah; Defendant Adlakonda's Phony Leave Form Request; Mr. Siddaramaiah's January 2009 DOL Wage Complaint

105.    Between about October 2008 and early January 2009, Apoorva Siddaramaiah, an H-1B employee employed by Defendant GSS, had on several occasions complained to Defendant Adlakonda about the fact that Mr. Siddaramaiah was benched and was not being paid any wages in violation of labor and immigration law.

106.    Defendant Adlakonda knew that Mr. Siddaramaiah, like other H-1B employees, was benched and was not being paid any wages in violation of labor and immigration laws, and Defendant Adlakonda took measures (under the direction of Defendant GSS, Defendant Marepally, Defendant Yerramsetti, Defendant Patel and others) to prevent Mr. Siddaramaiah from receiving wages.

107.    On one occasion on or about October 31, 2008:

a. Mr. Siddaramaiah complained to Defendant Adlakonda that Mr. Siddaramaiah was benched and was not being paid any wages in violation of labor and immigration law;

b. Defendant Adlakonda responded and informed Mr. Siddaramaiah that he would not be paid unless he worked on a third party work project;

c. Defendant Adlakonda further stated that if Mr. Siddaramaiah didn't like it, he could try to find another H-1B employer;

d. Defendant Adlakonda offered Mr. Siddaramaiah a vacation request document, which falsely indicated that Mr. Siddaramaiah had in the past requested voluntary leave from work; and

e. Defendant Adlakonda told Mr. Siddaramaiah that if he signed the form, it would allow Mr. Siddaramaiah to transfer to a new H-1B employer;

f. Had Mr. Siddaramaiah signed the phony leave request form, Defendant GSS could have used the form to try to falsely claim that Mr. Siddaramaiah's lack of project work was not because of Defendant GSS's actions and decisions, but rather that he had voluntarily elected leave and as such was not on nonproductive time, as defined by 20 CFR § 731(c)(7), that required payment of wages; and

g. Mr. Siddaramaiah did not sign the phony leave request form.

108. On or about January 7, 2009, Mr. Siddaramaiah filed a wage complaint with DOL.

**January 13, 2009 Correspondence from Plaintiff's Counsel to Defendant Marapally About Plaintiff and Other H-1B Workers' Benching and Unpaid Wages, and Notice of Legal Obligations As to Information Retention**

109.    In the month of January 2009, and for several months thereafter (and not until after the March 3, 2009 filing of Plaintiff's lawsuit), Plaintiff did not have knowledge of Mr. Siddaramaiah's DOL wage complaint, or have knowledge of the documentation concealment and destruction by Defendant GSS and others referenced above.

110.    On January 13, 2009, Plaintiff (through his counsel) sent Defendant Marepally and Defendant Patel documentation that:

      a.  Put Defendants on notice of material facts and legal claims herein relating to labor and immigration documentation fraud,  benching, and unpaid wages;

      b.  Put Defendants on notice of anti-retaliation laws that protected Plaintiff and others; and

      c.  Put Defendants on notice of information retention rights under federal law (including *Zubulake* informational retention requirements).

**January to March 2009 Informational Actions, Improper Financial Transactions, and Retaliation Toward Ms. Pinto for Her Objections and Complaints.**

111.     Ms. Pinto's Complaint correctly alleges the following at pars. 65-77:

      a.  In January 2009, Ms. Pinto was asked to pay two invoices that she suspected were fake.

b.  GSS America Director Raghu Adlakonda admitted that the invoices
were for commissions, though the invoices indicated a different
reason for the payment.

c.  Ms. Pinto informed Mr. Adlakonda that she would not pay any
more invoices unless she had executed W-9s.

d.  Mr. Adlakonda glared at Ms. Pinto when she told him she would
refuse to pay further invoices without executed W-9s.

e.  Also in January 2009, Ms. Pinto noticed suspicious money transfers
and asked management why GSS America was transferring millions
of dollars to GSS India and Infospectrum. Ms. Pinto complained to
management about what she referred to as "cooking the
Quickbooks."

f.  Soon thereafter, Mr. Adlakonda instructed the finance manager of
GSS India not to answer Ms. Pinto's questions.

g.  In addition, GSS America cut off Ms. Pinto's access to those areas of
Quickbooks that would allow her to see invoices, employee lists,
check deposits, profit and loss statements and the balance sheet.
These areas of Quickbooks had permitted her to see, among other
things, records showing money transfers between the four
companies.

h.  When she explained that she could not do her job without this
access, her access was restored. Ms. Pinto continued to have
unrestricted access to these areas of Quickbooks until the day
before she was terminated.

    i.   On March 3, 2009, Ms. Pinto drafted a letter to the Department of Labor ("DOL") on her GSS America computer. Later that day she printed it and faxed it to the Inspector General using a fax number she found on a government website.

    j.   The letter did not reveal her name but notified the DOL what she suspected was GSS America's submission of false immigration documents and credentials in order to obtain L1 visas.

    k.   The letter also notified the DOL of GSS America's interference with the DOL's investigation.

    l.   Ms. Pinto's letter also urged the DOL to forward a copy of her letter to the immigration authorities.

112.    That same day, March 3, 2009, and unbeknownst to Ms. Pinto, Plaintiff filed the instant lawsuit alleging labor and immigration law violations.

113.    Ms. Pinto's Complaint at pars. 80-93 correctly alleges:

    a.   Within days of faxing her [March 3, 2009] letter to the Department of Labor, Ms. Pinto learned that the Department of Labor had contacted a former consultant-employee to request information.

    b.   The former consultant-employee had come to GSS America's office to collect some paperwork.

    c.   Ms. Narwane, the employee who usually monitored Ms. Pinto's activities, was away from her desk so Ms. Pinto felt comfortable asking the consultant-employee if she could see the e-mail.

    d.   Ms. Pinto wanted to see the e-mail so she could make sure she had sent her report of illegal activity to the proper government agency.

e.  After Ms. Narwane returned, Ms. Pinto and the former consultant-
employee walked out of the office and huddled in the hallway while
he searched for the e-mail on his phone.

f.  On information and belief, Ms. Narwane alerted Mr. Adlakonda to
the fact that Ms. Pinto was talking to the former consultant-
employee.

g.  Mr. Adlakonda walked out of the office to the hallway where Ms.
Pinto was huddling with the former consultant-employee. Mr.
Adlakonda glared at them for several seconds and then went back
into the office.

h.  After Ms. Pinto notified the DOL about what she believed to be
possibly illegal practices, Ms. Pinto noticed some things about her
computer that caused her to suspect it was being searched by GSS
India or GSS America.

i.  On approximately six occasions, her computer screen went blank,
was frozen, had a popup message or otherwise indicated to her that
her computer was being accessed by someone other than herself.

j.  In addition, Ms. Pinto noticed from reviewing her computer's
recently opened items that someone had made a backup file of her
hard drive.

k.  On March 25, 2009, Tim Fox, the president of GSS America, called
Ms. Pinto into a meeting and asked her what value she brought to
the company.

l.  Ms. Pinto complained to Mr. Fox about the withheld payroll checks, fake organizational charts and dummy invoices.

m.  Mr. Fox screamed at Ms. Pinto that "if you don't like this hanky panky at GSS, look for a job." He then said something to the effect of: "if you open your mouth then a lot more people will be on the streets and you will be responsible for their families."

n.  On March 31, 2009, GSS America terminated Ms. Pinto's employment.

**Defendant Capalby's False Statements, After His Employment Ended With Defendant GSS, That Have Served in Furtherance of Defendant GSS's Ongoing Body Shop Operations and Immigration and Wage Fraud**

114.  On March 12, 2009, Defendant Capalby—after the original Complaint in this matter was filed, and after Defendant Capalby's employment with Defendant GSS had ended— made the following false representations to Plaintiff's counsel:

a.  That Defendant Capalby did not exercise any financial or operational control over any aspect of the business or employment practices of Defendant GSS, significant or otherwise as alleged in Plaintiff's complaint.

b.  That, beginning with Defendant GSS's acquisition of another entity (Infospectrum) in May-June 2006, Defendant Capalby was specifically instructed to remove himself from any day-to-day operational considerations of GSS and concentrate all his efforts towards a mergers and acquisitions strategy outlined by Defendant GSS's CEO.

115.    However, in contradiction to these assertions, Defendant Capalby had previously posted resume information on the internet that indicated while at Defendant GSS he was "VICE PRESIDENT CORPORATE AFFAIRS (2006 to Present) Promoted to direct and provide executive management for operations."

116.    Defendant Capalby's aforementioned March 12, 2009 representations— that he did not have any financial or operational control over any aspect of the business or employment practices of Defendant GSS, and that he had been removed from operational considerations and had focused on mergers and acquisitions issues as of May-June 2006— were knowingly false, and were made in a knowing attempt to conceal his knowledge of H-1B fraud detailed herein.

117.    In actuality, after Defendant Capalby's promotion to VP Corporate Affairs in 2006, he became responsible, along with Defendant Marapaly, for overseeing operations relating to the fraudulent submission of H-1B labor and immigration documentation and the fraudulent procurement of underpaid employment of H-1B employees (including Plaintiff).

118.    Defendant Capalby, while working for Defendant GSS as an in-house attorney or otherwise, did not at any time inform Plaintiff of the fraudulent and knowing false attestations in Plaintiff's LCA, which was a non-privileged communication. Defendant Capalby did not at any time inform Plaintiff that his LCA had knowingly false attestations to the effect that prevailing or actual wages would be paid, that required wages for nonproductive (benched) time would be paid, and other false LCA attestations.  To the contrary, Defendant Capalby actively participated in the creation and submission of said fraudulent H-1B documentation, and actively participated in

Defendant GSS's related operations of benching and underpaying Plaintiff and other H-1B workers.

119.     Defendant Capalby did not at any time inform any other H-1B worker(s) employed by Defendant GSS that their LCAs had false attestations to the effect that prevailing or actual wages would be paid, false attestations that the required wages for nonproductive (benched) time would be paid, and other false LCA attestations.

120.    Defendant Capalby resigned his employment with Defendant GSS America in the late summer of 2008, near the time the DOL audit began and shortly after Defendant GSS refused his request for a significant raise.

**Monies Received by Defendants Involved With Enterprise**

121.    All Defendants received monies and/or other economic benefit, either directly or indirectly, by their participation in the scheme involving Defendant GSS's employment and benching of H-1B workers, and Defendant GSS's related receipts of payments from the third party employers.

122.    Defendants received monies as follows:

> a. Defendant GSS— on the many instances and work projects its hundreds of unlawfully-procured H-1B workers have obtained specialty work projects and been deployed to work for third-party employers between October 2003 and the present date— has regularly received monies from said third-party employers, which third-party employers have paid monies for wages for the H-1B workers *and* additional monies and profits to Defendant GSS America;

b.  Defendant GSS India has received from Defendant GSS a substantial portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

c.  Defendant Marepally has received from Defendant GSS, in the form of wages and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

d.  Defendant Yerramsetti has received from Defendant GSS, in the form of wages and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

e.  Defendant Patel has received from Defendant GSS, in the form of wages and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

f.  Defendant Adlakonda has received from Defendant GSS, in the form of wages and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

g.  Defendant Capalby has received from Defendant GSS, in the form of wages and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

h.  Defendant Boeva has received from Defendant GSS, in the form of wages and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

i.  Defendant Akula has received from Defendant GSS, in the form of consulting services income and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

j.  Defendant ASL has received from Defendant GSS, in the form of consulting services income and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above;

k.  Defendant Chalasani has received from Defendant GSS, in the form of consulting services income and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above; and

l.  Defendant CES has received from Defendant GSS, in the form of consulting services income and/or otherwise, a portion of the monies Defendant GSS has regularly received from third-party employers of Defendant GSS's H-1B workers as described above.

**Plaintiff Was Not The Only H-1B Employee Harmed By Defendants' Conduct**

123.  Plaintiff was not the only individual subjected to Defendants' pattern of fraudulent and unlawful conduct.

124.    While Plaintiff was at Defendants' offices, he observed at least twenty other individuals who reported for work daily and performed job-search-related tasks (e.g. working on resumes, researching job openings, submitting applications to third-party employers, etc.).

125.    According to government records between the years 2004-2007, Defendant GSS had obtained LCAs (to employ H-1B employees) for:

      a.   231 H-1B employees for fiscal year 2008;

      b.   148 H-1B employees for fiscal year 2007;

      c.   143 H-1B employees for fiscal year 2006;

      d.   105 H-1B employees for fiscal year 2005; and

      e.   141 H-1B employees for fiscal year 2004.

126.    Like Plaintiff, virtually all of these H-1B employees were not paid wages or benefits to these similarly situated H-1B employees while they were employed in nonproductive (or "benched") status.

127.    Like Plaintiff, many of these other H-1B employees were harmed by Defendants scheme of knowingly making false offers of employment to these similarly situated H-1B employees in an attempt to solicit non-U.S.-citizens to either (a) relocate to America from their home countries; (b) transfer from a prior H-1B employer to H-1B employment with Defendants, thereby giving Defendants control over the H-1B employees' employment and their ability to lawfully remain in the U.S. (which was contingent on H-1B employment); or (c) accept employment with Defendant GSS after obtaining advanced degrees.

128.    As with Plaintiff, Defendant GSS petitioned and obtained Labor Certification from the DOL, and then sponsored an H-1B visa from USCIS, for these

similarly situated H-1B employees.  Defendant GSS also completed H-1B documentation that indicated (as did Defendants' job offer letters to these similarly situated individuals) that they would employ these similarly situated H-1B employees  in positions and that they would be provided benefits and paid an actual wage or a prevailing wage.

129.    As with Plaintiff, at the time Defendant GSS completed the H-1B documentation for these similarly situated H-1B employees, Defendants knew they would not employ them in promised positions and knew that there was no specific work or project Defendants had for them to work on.

130.    Defendants also knew that their aforementioned intended employment arrangements with these similarly situated H-1B employees violated H-1B requirements, and Defendants knowingly falsified H-1B documents in stating that they would be employed with Defendants in positions earning wages and benefits from Defendants.

131.    Under labor and immigration law, Defendants were required to pay these similarly situated H-1B employees the higher of the "prevailing wage" or the "actual wage" that Defendants stated on their LCAs.  Although these similarly situated H-1B employees maintained an employment relationship with Defendants, Defendants did not pay them their required wages for "benched" or nonproductive periods of time. Defendants failed to pay the similarly situated H-1B employees at the actual wage or prevailing wage, as is required by labor and immigration law.  Defendants also did not provide these s similarly situated H-1B employees with any benefits, or any money to be paid for benefits, during their employment.

132.    Defendants' failures to pay these similarly situated H-1B employees the higher of the prevailing wage or actual wage violated applicable immigration and labor

laws at 20 C.F.R. § 655.731(a)(3), 20 C.F.R. § 655.731(c)(1), (c)(5), and (c)(7), 8 U.S.C. § 1182 (n)(1)(A)(i)(II),  8 U.S.C. § 1182 (p)(3), 8 U.S.C. § 1182(t)(1)(A)(i)(II), and 8 U.S.C. § 1192(t)(3)(C)(vii)(I).  Defendants' failure to pay these similarly situated H-1B employees also violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*., the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*., and the Fair Labor Standards Act, 29 U.S.C. 201 *et seq*.  Defendants' conduct also constitutes fraud.

## COUNT I - VIOLATIONS OF 18 U.S.C. § 1961 ET. SEQ. ("THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT")

133.    Plaintiff incorporates paragraphs 1-132 by reference as if fully set forth herein.

134.    Each and every Defendant has been engaged in the common purpose and common goal of running, preserving and profiting from a massive employment temp service or "body shop," for which H-1B workers and their labor have been fraudulently obtained and provided.

135.    The Defendants, based on each Defendant's directives and conduct as detailed above, are part of an "enterprise" as defined by RICO law at 18 U.S.C. § 1961(4).

136.    The Defendants are associated in fact with each other, as each Defendant's directives and conduct specified above has been serving the common purpose and common goal of running, preserving and profiting from the massive "body shop" for which H-1B workers and their labor have been fraudulently obtained and provided.

137.    Defendants and their enterprise conducted "racketeering activities" as defined under the Racketeer Influenced and Corrupt Organizations ("RICO") Act because, per 18 U.S.C. § 1961(1)(B), their actions included acts indictable under and in violation of:

**(a)** 18 U. S. C. A § 1546(a), as Defendant GSS, Defendant Patel, and Defendant Capalby (with regard to Plaintiff's October 2007 LCA documentation, and with regard to other H-1B workers' LCA documentation dating back at least to October 2003), and under the direction of Defendant GSS, Defendant GSS India, Defendant Marepally, and Defendant Yerramsetti, were directly involved in the creation of, and submission to the U.S. government of, LCA documents that contained knowingly false attestations as detailed above, including knowingly false attestations that Plaintiff and the other H-1B workers involved were to be paid the required wages (including required wages for nonproductive/"benched" time) under labor and immigration laws as referenced on the LCAs, and in doing this, these Defendants and their enterprise fraudulently procured visas, permits, border crossing cards, alien registration receipt cards, and other documents, and fraudulently procured the employment and labor of Plaintiff and other H-1B workers;

**(b)** 28 U.S.C. §1746, as, in directing and performing the activities in (a), the referenced Defendants and their enterprise made false statements under oath and penalty of perjury with respect to material facts in an application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder;

**(c)** 18 U.S.C. § 1589(3), as Defendant GSS, Defendant Patel, and Defendant Capalby (with regard to Plaintiff's October 2007 LCA

47

documentation, and with regard to other H-1B workers' LCA documentation dating back at least to October 2003), and under the direction of Defendant GSS, Defendant GSS India, Defendant Marepally, and Defendant Yerramsetti, knowingly obtained the employment and labor of Plaintiff (from October 2007 to October 2008) and of other H-1B workers with the knowledge they would be "benched" with no pay and would not be paid the required wage under H-1B labor and immigration law, and these Defendants and their enterprise thus abused the H-1B visa law and legal process because that law and process requires that an H-1B employer promise (and intend) to pay the required wages (including the required wages for nonproductive/benched time) in order to obtain an H-1B worker's employment, labor and services;

 **(d)** 18 U.S.C. § 1589(3), as Defendants and their enterprise knowingly provided the employment and labor of Plaintiff (from October 2007 to October 2008) and of other H-1B workers, with the knowledge these H-1B workers were being "benched" with no pay and were not being paid the required wage under H-1B labor and immigration law, and these Defendants and their enterprise thus abused the H-1B visa law and legal process because that law and process requires that an H-1B employer pay the required wages (including the required wages for nonproductive/benched time) in order to lawfully provide an H-1B worker's employment, labor and services. Defendants and their enterprise specifically facilitated

these unlawful failures to pay lawfully required H-1B wages, and
this unlawful providing of H-1B labor, by:

    (i)    Defendant GSS's failures to pay Plaintiff (in payroll
periods between January 2008 and October 2008)
and other H-1B workers (in payroll periods between at
least January 2004 and present) their required wages
were conducted under the directives of Defendant
GSS, Sirish Ganti (an employee of Defendant GSS
working under the knowing directives of Defendant
Adlakonda), and ultimately under the knowing
directives of Defendant Adlakonda, Defendant Patel,
Defendant Capalby, Defendant Marepally, and
Defendant Yerramsetti, Defendant GSS and
Defendant GSS India;

    (ii)    The specified Defendants' directives and failures to
provide Plaintiff his actual wage of $60,000 and other
H-1B workers their required wages for the pay periods
between January 8, 2008 and October 31, 2008 were
in explicit and knowing violation of H-1B labor and
immigration wage law under 20 CFR 655.731 (also
referenced by the LCA) which requires payment of the
required wage, and requires payment of the required
wage for nonproductive (benched) time;

(iii)    Defendant GSS's failures to pay Plaintiff his actual wage of $60,000 for all pay periods (including nonproductive/benched periods) between January 8, 2008 and October 31, 2008, and failures to pay other H-1B workers all their required wages between January 2004 and present, were in knowing relation to, and furtherance of, the knowingly false and fraudulent LCA attestations about required wages and nonproductive/benched time, detailed above, which violated labor and immigration document fraud provisions of 18 U.S.C. 1546;

(iv)    Defendant GSS's failures to pay Plaintiff and other H-1B workers their required wages were further facilitated by, in response to internal complaints about unpaid wages by Plaintiff, Mr. Siddaramaiah and others (as detailed above), by responses of threats, refusals to do anything about unpaid wages, and/or knowingly false promises something would be done about unpaid wages, by Defendant Patel, Defendant Adlakonda, and Shyamu Badugu, which actions were conducted under the direction of Defendant GSS, Defendant GSS India, Defendant Marepally, and Defendant Yerramsetti, and the conducting of which facilitated the continued non-

payment of required wages and the unlawful providing of H-1B labor.

**(e)** 18 U.S.C. § 1590 ["Trafficking with respect to … involuntary servitude, or forced labor"], as Defendants and their enterprise abused the H-1B legal process [for reasons detailed in the preceding pars. (c)-(d)] and, in conjunction with the facts that Defendant GSS controlled Plaintiff and other H-1B workers' visa status, maintained a guesthouse, and otherwise exerted control, fraud and coercion over Plaintiff and other H-1B workers, Defendants and their enterprise therefore "… knowingly recruit[ed], harbor[ed], … provide[d], or obtain[ed] by any means, any person for labor or services in violation of this chapter [Chapter 77, at 18 U.S.C. §§ 1581- 1595]]";

**(f)** 18 U.S.C. § 1592 ["Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor"], as Defendants and their enterprise knowingly possessed the immigration documents of another person (Plaintiff and other H-1B workers) and did so: **(i)** in the course of a violation of section 1589 and 1590; **(ii)** with intent to violate section 1589 and 1590; and **(iii)** to prevent or restrict without lawful authority the Plaintiff's liberty to move or travel, in order to maintain the labor or services of the Plaintiff per section 103 of the Trafficking Victims Protection Act of 2000.

**(g)** 18 U.S.C. § 1592, as Defendants and their enterprise knowingly directed and exhibited unlawful conduct with respect to documents in furtherance of forced labor, involuntary servitude and trafficking, as Defendants and their enterprise knowingly destroyed, concealed, removed, confiscated, or possessed immigration documents in the course of the above described violations of 18 U.S.C. § 1589 and 18 U.S.C. § 1590. Specifically:

**(i)** Defendant Akula, Defendant Associates Systems LLC, Defendant Chalasani, Defendant CES, and The Chugh Firm as detailed above, provided consulting and/or legal services (for which they were compensated) to Defendant GSS which related to one or more H-1B wage audits by DOL, including DOL's involvement with and auditing of Defendant GSS in August and September 2008, and the aforementioned Defendants and entities were directed by Defendant GSS, Defendant Marepally, Defendant Yerramsetti, Defendant Patel and others to participate in and/or direct activities that have directly or indirectly concerned the concealing and destruction of labor and immigration law documents and information that related to DOL inquiries of Defendant GSS that occurred during August and September 2008.

**(ii)** As detailed above, Defendant Capalby and others have continued to make knowing and material misstatements, directives, concealments and omissions

concerning the H-1B body shop and H-1B fraud, which have served to facilitate and further the enterprise and H-1B fraud.

**(h)** 18 U.S.C. Section 1341, as Defendants and their enterprise, in pursuit of their scheme to obtain employment and labor from Plaintiff and other H-1B workers through the H-1B process and to underpay them, and to conduct other activities above, and for the purpose of executing that scheme, caused to be delivered various communications via the U.S. mail.

**(i)** 18 U.S.C. Section 1343, as Defendants and the enterprise, in pursuit of their scheme and for the purpose of executing that scheme, caused to be delivered various communications or effectuated various transactions, by wire.

138.    Per 18 U.S.C. § 1961 (5), Defendants and the enterprise have conducted a pattern of racketeering activity, as Defendants and the enterprise committed at least two acts of the racketeering activities identified above within ten years.

139.    Defendants have violated 18 U.S.C. § 1962 ("Prohibited activities" of RICO), because they received income derived from a pattern of racketeering activity, and used and/or invested at least part of such income or the proceeds of such income in the establishment and/or operation of an enterprise which was engaged in, or the activities of which affected, interstate or foreign commerce.

140.    Defendants violated 18 U.S.C. § 1962(b) because they, through a pattern of racketeering activity, and/or through collection of unlawful debt, maintained interests

in and/or control of the enterprise described herein which was engaged in, or the activities of which affected, interstate or foreign commerce.

141.    Defendants violated 18 U.S.C. § 1962(c) because: (a) they were employed by and/or associated with an enterprise which was engaged in, or the activities of which affected, interstate or foreign commerce; and (b) they conducted and/or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity and/or collection of unlawful debt.

142.    Defendants violated 18 U.S.C. § 1962(d) because they conspired to violate any of the provisions of 18 U.S.C. § 1962, subsection (a), (b), or (c).

143.    WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for all civil remedies under RICO at 18 U.S.C. § 1964, including treble damages, cost of the suit, and reasonable attorney's fees.

## COUNT II - VIOLATIONS OF 18 U.S.C. §§ 1581-1595 ("PEONAGE, SLAVERY, AND TRAFFICKING IN PERSONS")

144.    Plaintiff incorporates paragraphs 1-143 by reference as if fully set forth herein.

145.    For reasons detailed in par. 137 (c)-(e) above, Defendants violated 18 U.S.C. § 1589(3) ["Forced labor"], and 18 U.S.C. § 1590 ["Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor"].

146.    For each said violation, 18 U.S.C. § 1595(a) authorizes Plaintiff to bring a civil action against Defendants in an appropriate district court of the United States, and to recover damages and reasonable attorneys fees for said civil actions.

147.    WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for:

**(a)** all civil remedies under 18 U.S.C. § 1595(a) to recover damages and reasonable attorneys fees; and

**(b)** all civil remedies under 18 U.S.C. § 1593 ["Mandatory restitution"] to be paid *in addition to* treble RICO damages and any other civil penalties authorized by law as well as full amount of each victim's losses (29 U.S.C. 201 et seq.).

## COUNT III - VIOLATIONS OF 820 ILCS 115/1 *et seq*. ("ILLINOIS WAGE PAYMENT AND COLLECTION ACT"): AS TO ALL DEFENDANTS EXCEPT DEFENDANTS AKULA, ASL, CHALASANI, AND CES

148.    Plaintiff incorporates paragraphs 1-147 by reference as if fully set forth herein.

149.    At all relevant times herein, Defendants were "employers" as defined in the Illinois Wage Payment and Collection Act, 820 ILCS 115/2.

150.    Plaintiff was Defendants' "employee" as defined in the Illinois Wage Payment and Collection Act, 820 ILCS 115/2.

151.    Defendants owed Plaintiff "wages" pursuant to an employment contract or agreement between Defendants and Plaintiff as defined in the Illinois Wage Payment and Collection Act, 820 ILCS 115/2.

152.    Defendants failed to pay Plaintiff wages in violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*.

153.    Plaintiff was harmed by Defendants' failure to pay wages in violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*.

154.    At least three days prior to filing this action, Plaintiff made a demand in writing for the wages he was owed.

155.   WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for:

        **(a)** wages owed pursuant to his employment contract or agreement with Defendants;

        **(b)** reasonable attorneys' fees (per 705 ILCS 225/1);

        **(c)** if Defendants fail to pay wages ordered by the Court within 15 days, a penalty of 1% per calendar day for each day of delay in paying wages this Court orders Defendants to pay up to an amount equal to twice the sum of unpaid wages (per 820 ILCS 115/14); and,

        **(d)** all other civil remedies available under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.*

## COUNT IV - VIOLATIONS OF 820 ILCS 105/1 *et seq*. ("ILLINOIS MINIMUM WAGE LAW"): AS TO ALL DEFENDANTS EXCEPT DEFENDANTS AKULA, ASL, CHALASANI, AND CES

156.   Plaintiff incorporates paragraphs 1-155 by reference as if fully set forth herein.

157.   At all relevant times herein, Defendants were "employers" as defined in the Illinois Minimum Wage Law, 820 ILCS 105/3(c).

158.   Plaintiff was Defendants' "employee" as defined in the Illinois Minimum Wage Law, 820 ILCS 105/3(d).

159.   Defendants owed Plaintiff "wages" as defined in the Illinois Minimum Wage Law, 820 ILCS 105/3(b).

160.   Defendants failed to pay Plaintiff wages in violation of the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*

161.    Defendants failed to keep true and accurate records of the name, address and occupation of each of his employees, the rate of pay, and the amount paid each pay period to each employee, and the hours worked each day in each work week by each employee in violation of the Illinois Minimum Wage Law, 820 ILCS 105/8.

162.    WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for:

(a) underpaid wages owed pursuant to his employment with Defendants;

(b) cost of the suit and reasonable attorneys' fees (per 820 ILCS 105/12);

(c) damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid (pursuant to 820 ILCS 105/12); and,

(d) all other civil remedies available under the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*.

**COUNT V - VIOLATIONS OF 29 U.S.C. 201 *et seq.* ("FAIR LABOR STANDARDS ACT"): AS TO ALL DEFENDANTS EXCEPT DEFENDANTS AKULA, ASL, CHALASANI, AND CES**

163.     Plaintiff incorporate paragraphs 1-162 by reference as if fully set forth herein.

164.     At all relevant times herein, Defendants were "employers" as defined in the Fair Labor Standards Act, 29 U.S.C. § 203(d).

165.     Plaintiff was Defendants' "employee" as defined in the Fair Labor Standards Act, 29 U.S.C. § 203(e).

166.     Defendants owed Plaintiff minimum wage as defined in the Fair Labor Standards Act, 29 U.S.C. § 206.

167.     Defendants failed to pay Plaintiff wages for time worked in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 215(a)(2).

168.     Defendants failed to make, keep and preserve records of the persons employed by them and of the wages, hours, and other conditions and practices of employment maintained by them in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 211(c) and 215(a)(5).

169.     Defendants willfully violated the Fair Labor Standards Act.

170.     WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for:

  **(a)** underpaid wages owed pursuant to his employment with Defendants;

  **(b)** liquidated damages in an amount equal to underpaid wages (per 29 U.S.C. § 216(b));

**(c)** cost of the suit and reasonable attorneys' fees (per 29 U.S.C.

§ 216(b)); and,

**(d)** all other legal or equitable relief as appropriate to effectuate the

purposes of the Fair Labor Standards Act, 29 U.SC. 201 *et seq* (per

29 U.S.C. § 216(b).

## COUNT VI - VIOLATIONS OF ILLINOIS COMMON LAW ("FRAUD")

171.    Plaintiff incorporates paragraphs 1-170 by reference as if fully set forth

herein.

172.    Defendants knowingly misrepresented facts in offering Plaintiff

employment.

173.    Defendants knowingly misrepresented facts in completing and submitting

H-1B and LCA application documents to DOL and to USCIS on behalf of Plaintiff.

174.    Plaintiff relied on Defendants' misrepresentations to his detriment.

175.    As a result of Defendants' misrepresentations, Plaintiff was damaged.

176.    WHEREFORE, Plaintiff prays for judgment against Defendants, jointly

and severally, for:

**(a)** underpaid wages owed pursuant to his employment with

Defendants;

**(b)** compensatory damages commensurate with the harm Plaintiff

suffered as a result of Defendants' misrepresentations ;

**(c)** punitive damages to punish Defendants for their fraudulent

conduct; and,

**(d)** all other legal or equitable relief as appropriate under Illinois common law.

***PLAINTIFF DEMANDS A TRIAL BY JURY.***

Respectfully submitted,

/s/ J. Bryan Wood

By: _____

J. Bryan Wood
One of Plaintiff's Attorneys

Michael F. Brown
Peterson, Berk & Cross, S.C.
200 E. College Ave.
Appleton, WI 54912
920-831-0300
920-831-0165 (FAX)
Email: mbrown@pbclaw.com
(*application for admission filed*)

Vonda K. Vandaveer
V.K. Vandaveer, P.L.L.C.
P.O. Box 27317
Washington, DC 20038-7317
202-340-1215
202-521-0599 (FAX)
Email: atty@vkvlaw.com
(*pro hac vice motion forthcoming*)

J. Bryan Wood
The Law Office of J. Bryan Wood
53 W. Jackson Blvd., Ste. 660
Chicago, IL 60604
312-545-1420
312-577-0749 (FAX)
E-mail: bryan@jbryanwoodlaw.com

Electronically filed June 19, 2009

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he served a true and correct copy on all counsel of record for Defendants not newly added as part of his amended claims by filing this Amended Complaint via ECF on June 19, 2009.

_____/s/ J. Bryan Wood___
J. Bryan Wood
