# Exhibit A

# U.S. CITIZENSHIP AND IMMIGRATION SERVICES

# H-1B Benefit Fraud & Compliance Assessment



September 2008

**BACKGROUND:** The Office of Fraud Detection and National Security (FDNS), a Division of the National Security and Records Verification (NSRV) Directorate, drafted this report, in collaboration with the other USCIS Directorates and the USCIS Office of Chief Counsel. All USCIS components reviewed the cases involving fraud or technical violations and the proposed enhancements to the H-1B program and concurred on the report.

In February 2005, U.S. Citizenship and Immigration Services (USCIS) developed and implemented the Benefit Fraud Assessment (BFA) Program to evaluate the integrity of various nonimmigrant and immigrant benefit programs that require the adjudication of an application or petition. While conducting these assessments, the entire scope of a program is analyzed for fraud vulnerabilities as well as for customer compliance with program requirements. For this reason, USCIS recently retitled the program the Benefit Fraud and Compliance Assessment (BFCA) Program. Although the name of the program has been changed to reflect the full range of issues reviewed, the methodology used to conduct the assessments has not changed. The applications and petitions reviewed are not selected because they are suspected of fraud, but are a statistically valid random sampling[1] of pending and completed cases over a recent six-month period. The results of the BFCA serve as a basis for proposed changes to existing regulations, policies, and procedures, and as warranted, recommended legislative remedies.

The BFCA involves conducting internal and open source systems queries by FDNS Immigration Officers (IOs) to verify information entered on and submitted in support of applications and petitions as well as domestic site visits and overseas verification to validate claimed relationships, employment, and qualifications. In the case of employment-based petitions, FDNS IOs conduct site visits to verify the existence of the petitioning company and the place of employment and to interview persons who should be familiar with the petition and job offer. FDNS IOs contact Immigration and Customs Enforcement (ICE) counterparts prior to commencing field inquiries to prevent interference with any ICE operations. As a rule, FDNS IOs do not conduct site visits when the petitioner or beneficiary is under criminal investigation.

In keeping with the joint USCIS/ICE anti-fraud strategy, when a BFCA concludes that the petitioner or beneficiary has committed fraud, FDNS refers the case to ICE for consideration of formal criminal investigation and prosecution.[2] ICE then has 60 days to accept the case for investigation or decline it and return it to FDNS. If ICE declines to open a criminal investigation, FDNS forwards the case with its administrative findings to a USCIS adjudications component for denial or revocation of the petition or application, as appropriate. According to current policy, if the beneficiary is in the U.S., he or she is placed in removal proceedings. A lookout summarizing the fraud finding is also posted in case the beneficiary does not appear at his or her removal proceeding or attempts to pursue other immigration benefits. The FDNS IO enters the BFCA case into the FDNS Data System (FDNS-DS) so that the information may be tracked and so that known fraud indicators may be compared against incoming receipts in case the petitioner or beneficiary files other applications or petitions.

---

[1] Since there were no previous estimates of fraud available within the H-1B population, the Department of Homeland Security Office of Immigration Statistics (OIS) recommended a simple random sample for a proportion. The sample design assumed a rate of occurrence not more than 20 percent, a confidence level of 95 percent, and a margin of error of plus or minus 5 percent.

[2] This process is based on procedures established in the February 2006, USCIS/ICE Memorandum of Agreement (MOA).

To understand the findings contained in this assessment of the H-1B program, it is important to understand the following applicable statutory, regulatory, and procedural requirements:

**H-1B NONIMMIGRANT CLASSIFICATION:** The I-129 petition is the vehicle used by an employer to petition for an alien to come to the U.S. as an H-1B nonimmigrant worker to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (the "Act"). A specialty occupation is one that requires the theoretical and practical application of a body of highly specialized knowledge to perform fully. It requires the attainment of a bachelor's or higher degree in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the U.S. Specialty occupations include, but are not limited to computer professionals, engineers, accountants, financial analysts, management consultants, attorneys, business executives, university professors and teachers, and scientists and researchers.

The H-1B nonimmigrant classification also includes aliens coming to the United States to perform services of an exceptional nature relating to a project administered by the U.S. Department of Defense and fashion models who have attained national and international acclaim.

**LABOR CONDITION APPLICATION REQUIREMENT ON EMPLOYERS:** Section 212(n) of the Act provides that a prospective employer of an H-1B alien must file a Labor Condition Application (LCA) with the Department of Labor (DOL). Section 212(n) of the Act states that no alien may be admitted to the U.S. or otherwise provided H-1B nonimmigrant status unless the prospective employer has filed with DOL an application stating that the employer will:

- pay the alien the actual wage level paid by the employer to all other individuals with similar qualifications and experience for the specific employment in question or the prevailing wage level for the occupation classification in the area of intended employment, whichever is greater, based on the best information available at the time of filing the application; and

- provide working conditions for the prospective H-1B nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

The LCA wage determination relates directly to the geographical area or areas where the alien is slated to work. A prospective H-1B employer filing the LCA with the DOL is limited to listing only two geographical areas (worksites) per LCA. If a prospective employer intends to employ an H-1B worker in more than two locations (except short-term placements meeting the specified conditions under 20 C.F.R. 655.735), he or she must file additional LCAs to cover the other locations. Likewise, if an H-1B employer who has already filed an I-129 petition with USCIS intends to employ the alien in additional locations (beyond those listed on the original LCA), he or she must file additional LCA(s) with DOL, as appropriate.

**FILING FEES ASSOCIATED WITH H-1B PETITIONS:** There are several different fees associated with filing a petition for an H-1B nonimmigrant worker:

- The base filing fee for the I-129 petition of $320[3]

- The additional fee required by the H-1B Visa Reform Act of 2004[4] of:

    o $1,500 for businesses with 26 or more full-time employees and
    o $750 for businesses with 25 or fewer full-time employees

    In each instance, the number of full-time employees includes employees of any U.S. affiliate or subsidiary of the petitioning employer.

- A $500 Fraud Prevention and Detection Fee (also authorized by the H-1B Reform Act of 2004), which must be paid by:

    o most H-1B employers seeking a worker's initial grant of H-1B nonimmigrant status and
    o any employer seeking to hire an existing H-1B worker currently employed by another employer.

- Additionally, employers may choose to pay an extra $1,000 premium processing fee if they seek expedited adjudication.

Section 212(n)(2)(C)(vi)(II) of the Act as well as DOL regulations at 20 CFR 655.731(c)(9) and (10) prohibit H-1B petitioners from passing H-1B "ACWIA" filing fees (pursuant to section 214(c)(9) of the Act) on to the beneficiary.

Furthermore, when filing the LCA, the prospective employer declares that he or she will comply with the Labor Condition Statements as set forth in the cover pages of that form and in the DOL regulations at 20 CFR, Part 655, Subparts H and I.

---

[3] *Effective July 30, 2007, the filing fee for H-1B petitions was changed from $190 to $320.*

[4] *On October 21, 1998, Congress enacted the American Competitiveness and Workforce Improvement Act (ACWIA), and on December 8, 2004, Congress enacted the Omnibus Appropriations Act of FY 2005, (otherwise commonly known as the "H and L Reform Act" or the "The H-1B Visa Reform Act of 2004"), which amended INA 214(c)(9) to reinstitute and modify the additional fees previously imposed by ACWIA (the ACWIA fees had expired effective October 1, 2003). The H-1B Visa Reform Act of 2004 raised the fees previously applicable under ACWIA to $1,500 or $750, depending on the size of the employer. For ease of reference, such fees will be referred to as "ACWIA" fees in this report. Effective December 8, 2004, employers with 26 or more U.S. full-time-equivalent employees, including all affiliated or subsidiary entities, who seek to employ an H-1B nonimmigrant, must pay $1,500, in addition to the base filing fee for a Form I-129, Petition for Temporary Nonimmigrant Worker. For employers with 25 or fewer U.S. full-time-equivalent employees, including all affiliated or subsidiary entities, the fee is $750, in addition to the base filing fee for a Form I-129. Under the statute, some petitioners are exempt from this fee altogether. The H-1B Visa Reform Act of 2004 also amended section 214(c) of the INA by adding a new subsection (c)(12), which imposes a $500 fraud prevention and detection fee on certain employers filing H-1B petitions. Effective March 8, 2005, employers seeking an initial grant of H-1B nonimmigrant status or authorization for an existing H-1B (or L-1 alien seeking to become an H-1B nonimmigrant) to change employers must submit the $500 fraud prevention and detection fee. The $500 fee does not need to be submitted by: (1) employers who seek to extend a current H-1B alien's status where such an extension does not involve a change of employers; (2) employers who are seeking H-1B1, Chile-Singapore Free Trade Act nonimmigrants, or (3) dependents of H-1B principal beneficiaries.*

20 CFR 655.731(c)(11) states that "[a]ny unauthorized deduction taken from wages is considered by the Department [of Labor] to be non-payment of that amount of wages." 20 CFR 655.731(c)(12) provides, "[w]here the employer depresses the employee's wages below the required wage by imposing on the employee any of the employer's business expense(s), the Department will consider the amount to be an unauthorized deduction from wages even if the matter is not shown in the employer's payroll records as a deduction." Therefore, the petitioner may not take deductions from the beneficiary's pay to recoup an employer's business expense, to cover the costs incurred in the petition process, or to recover the $500 Anti-Fraud Fee if it depresses the alien's wages below the prevailing wage, or to recover any portion of the $750/$1,500 filing fee.

**METHODOLOGY:** To ensure that the beneficiary was present in the U.S. and thus available for an interview regarding their purported employment, this BFCA drew a random sample[5] of case files from a population of I-129 petitions filed on behalf of individuals who were:

- seeking to extend their existing H-1B nonimmigrant status either with the current employer or a new employer or

- seeking new employment as an H-1B nonimmigrant while currently residing in the United States in another nonimmigrant visa status.

The H-1B BFCA sample consisted of 246 cases drawn from a total population of 96,827 approved, denied, or pending I-129 petitions filed between October 1, 2005 and March 31, 2006. The overwhelming majority of the petitions in the BFCA sample were filed in behalf of beneficiaries who already held H-1B visas.

Petitions filed in behalf of beneficiaries who were still residing abroad were excluded from the population because the ability to interview the beneficiary and verify information once he/she enters the country and presumably begins employment with the petitioner significantly enhances our ability to detect fraud or technical violations. Until the beneficiary enters the U.S. and commences employment with the petitioner, USCIS is unable to verify information such as payment of the proffered wage, the performance of the stated job duties, and employment at the location stated on the petition and LCA. However, this exclusion should have minimal impact on the results, because only about 1,200 petitions for initial H-1B status were filed during the timeframe used to draw the sample.

FDNS IOs, located at various USCIS district offices throughout the country, conducted the first stage of the assessment. Upon receipt of an I-129 BFCA petition, the FDNS IO reviewed all pertinent data and performed the required systems checks and site visits to validate the information submitted on the petition.[6] The primary objectives of the site visit were to:

---

[5] Since there were no previous estimates available within the H-1B population, the Department of Homeland Security Office of Immigration Statistics (OIS) recommended using a simple random sample for a proportion. The sample design assumed a rate of occurrence not more than 20 percent, a confidence level of 95 percent, and a margin of error of plus or minus 5 percent.

[6] In extenuating circumstances, the FDNS IO requested a waiver of the site visit requirement from HQFDNS.

- verify the existence of the petitioning employer;

- verify the stated employer/employee relationship between the petitioner and beneficiary;

- verify that the beneficiary is or will be employed in the capacity specified and at the location(s) specified;

- verify that the beneficiary has the requisite experience and/or qualifications;

- reconcile discrepancies; and

- verify the existence or non-existence of multiple and/or duplicate filings by the same petitioner.

During the site visits conducted on all BFCA cases, FDNS IOs interviewed the petitioner. If the beneficiary had been admitted as an H-1B nonimmigrant for the same location, the IO also interviewed the beneficiary.

Upon completion of each BFCA case, the field FDNS IO forwarded the results to the Regional FDNS IO (RIO) for review. If the RIO concurred with the IO's finding, the RIO forwarded the case to HQFDNS for a second review. At least two HQFDNS personnel conducted the second review to ensure accuracy and consistency. If the HQFDNS personnel had any questions regarding the field findings, they returned the case to the field FDNS IO with specific instructions regarding any additional action required.

**TERMINOLOGY:** For purposes of this BFCA, fraud is defined as a willful misrepresentation, falsification, or omission of a material fact. Fraud entails any willful manifestation that amounts to an assertion or assertions not in accordance with the facts; a knowing untrue statement of fact; or a purposeful, incorrect, or false representation material to the adjudication of the petition. This definition is consistent with section 212(a)(6)(C)(i) of the Act, which states, "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this Act is inadmissible."

The BFCA identified some circumstances where, although there was no evidence of willful fraud, there was evidence that the employer or alien beneficiary had failed to comply with applicable laws and regulations. For purposes of this BFCA, FDNS has identified those situations as having at a minimum a technical violation(s). Examples include instances where:

- the H-1B employer required the beneficiary to pay the ACWIA fee or deducted certain fees associated with filing the I-129 petition, effectively lowering the beneficiary's wages to less than the required prevailing wage;

- the employer failed to pay the beneficiary at least the prevailing wage for the particular occupation in the specific geographical location, as noted and attested to on the LCA filed with DOL;

- the beneficiary was working in a geographical location not covered by a valid LCA filed with DOL as required by 20 CFR 655.730(c)(4)(v); and,

- the employer placed the beneficiary in a non-productive status, commonly referred to as "benching" (where the beneficiaries are not paid or paid less than the full hours specified on the petition), when work was not immediately or continuously available.

It is important to note that when reviewing the I-129 petitions in the BFCA sample population, USCIS took a comprehensive look at all aspects of a particular filing, beginning with the filing of the LCA with the Department of Labor through the entire time that the beneficiary was in H-1B nonimmigrant status. The intent was to examine all levels of fraud, technical violation(s), or abuse in the H-1B nonimmigrant visa program based on a snapshot in time; not to investigate the case for criminal prosecution. USCIS examined employer compliance with all statutory and regulatory provisions associated with the H-1B nonimmigrant visa program, including the terms and conditions of the LCA. USCIS also noted any LCA violations that were uncovered.

The types of misrepresentations uncovered through the BFCA included cases were:

- the business did not exist;

- the educational degrees or experience letters submitted were confirmed to be fraudulent;

- signatures had been forged on supporting documentation; and

- the beneficiary was performing duties that were significantly different from those described on the LCA and I-129 petition. (In one instance, the position described on the petition and LCA was that of a business development analyst. However, when USCIS conducted its review, the petitioner stated the H-1B beneficiary would be working in a laundromat doing laundry and maintaining washing machines.)

Many of the cases reviewed exhibited multiple fraud indicators and/or technical violations.

**KEY STATISTICAL FINDINGS:** The key statistical findings and estimates are:

- Number of Fraud or Technical Violation(s) Cases in BFCA sample:

    ✓ There were a total of 51 cases within the sample of 246 H-1B petitions that were confirmed as representing fraud, a technical violation, and/or multiple technical violations. For BFCA reporting purposes, these 51 cases contain final determinations of either fraud or technical violation(s). (It should also be noted that not all violations will rise to the level that would warrant a criminal investigation or prosecution. However, the H-1B program vulnerabilities and abuses identified through this assessment need not lead to a criminal investigation and/or prosecution in order to be reported for BFCA purposes since systemic vulnerabilities ultimately may contribute to higher rates of successful fraudulent filings.)

The percentage breakdown is as follows:

**Fraud:** 13.4% (33 cases)
**Technical Violation(s):** 7.3% (18 cases)
**Overall Violation Rate:** 20.7% (21%)

It is important to note that for this particular sample size of 246 cases, the percentages listed above represent statistically valid figures based on generally accepted statistical reporting guidelines.[7] In addition, although there were cases that exhibited both fraud and technical violations if a case rose to the level of material misrepresentation, it was included in the fraud category and not the technical violation category.

- Case Status Within BFCA Sample Population:

    ✓ USCIS had already approved 217 cases (88% of the sampled petitions); 19% of the approved cases were associated with some type of fraud or technical violation(s).
    ✓ There were 24 cases (10% of the sampled cases) still pending; 29% of these pending cases were associated with some type of fraud or technical violation(s).
    ✓ USCIS had already denied 5 cases (2% of the sampled cases); 2 of the denied cases (40%) were associated with some type of fraud or technical violation(s).
    ✓ USCIS provided Premium Processing Service to 70 cases (28% of the sampled cases); 17% of these cases were associated with some type of fraud or technical violation(s).[8]

- Estimates Based on Confirmed Fraud or Technical Violation(s):

    ✓ The H-1B population from which the BFCA sample was selected included 96,827 H-1B petitions.
    ✓ When applying the overall violation rate of 20.7% to the overall H-1B population, a total of approximately 20,000 petitions may have some type of fraud or technical violation(s).[9] If we extrapolate this number based on the 13.4% fraud and 7.3% technical violation rates found in the sample, this equates to approximately 13,000 petitions that may be fraudulent and approximately 7,000 petitions that may be associated with some type of technical violation(s).

**TYPES OF FRAUD OR TECHNICAL VIOLATIONS:** As previously noted, some cases were identified as having more than one type of fraud or technical violation. For example, there were cases already under ICE investigation that also contained fraudulent documents. Another case involved fraudulent documents and also contained instances where the beneficiary was not working at the location listed on the I-129 or the LCA and was not

---

[7] Since there were no previous estimates of fraud available within the H-1B population, the Department of Homeland Security Office of Immigration Statistics (OIS) recommended using a simple random sample for a proportion. The sample design assumed a rate of occurrence not more than 20 percent, a confidence level of 95 percent, and a margin of error of plus or minus 5 percent.

[8] It is interesting to note that the violation rate for premium processing cases was lower than the 21% overall violation rate.

[9] The actual number of H-1B petitions with a violation may range from 15,500 to 25,600 (using a 95 percent confidence limit).

performing the job duties stated on the I-129 or the LCA. In each of these examples, the instances of fraud or type of abuse were recorded in each appropriate corresponding category. Out of the 246 cases included in the sample, USCIS identified 51 cases that had some type of technical violation or fraud. Each instance or type of abuse is summarized in the data below.

1. **Job location not listed on the I-129 petition and LCA (28 out of the 51 cases with a technical violation or abuse, which is 55% of the overall violations)**

    ✓ Out of these 28 cases, 15 had a final determination of fraud, and 13 had a final determination of Technical Violation.

    - Both the applicable statute and regulations require that the H-1B beneficiary work only at locations covered by a valid LCA.

    - Site visits revealed that the beneficiary was not working or had never worked at the specified location on the LCA or I-129 petition.

2. **Beneficiary not receiving the prevailing wage (14 out of the 51 cases with a technical violation or abuse, which is 27% of the overall violations)**

    ✓ Out of these 14 cases, 9 had a final determination of fraud, and 5 had a final determination of technical violation.

    - Financial records established that the beneficiary is or was being paid below the prevailing wage.

    - During the site visit
        o the beneficiary claimed that he or she was being paid less than the prevailing wage; and/or
        o the petitioner admitted to paying the beneficiary less than the prevailing wage.

    - Non-productive status or "benching" is also included in this category.
        o "Benching" occurs when an employer temporarily decides to place a beneficiary in nonproductive status without pay, or with reduced pay, during periods of no work. It should be noted that even H-1B workers without a current work assignment (i.e., benched) must be paid the prevailing wage.

    - Interviews conducted during the course of site visits established that either the beneficiary or the petitioner stated that the petitioner deducted the fees associated with filing the H-1B petition from the beneficiary's salary, which resulted in the beneficiary's salary dropping below the prevailing wage.

3. **Fraudulent/Forged Documents (10 out of the 51 cases with a technical violation or abuse, which is 20% of the overall violations)**

    ✓ Out of these 10 cases, all 10 had a final determination of fraud.

    - Overseas verification requests helped identify fraudulent degrees and work experience letters.

    - Interviews conducted during the site visits revealed that signatures had been forged on specific documents germane to the adjudication of the I-129 or that contents within the document were false.

    - Analysis of the petition and supporting documents uncovered misrepresentation to establish eligibility for the benefit sought

4. **Storefront/Shell Business/No Bona Fide Job Offer (7 out of the 51 cases with a technical violation or abuse, which is 14% of the overall violations)**

    ✓ Out of these 7 cases, 6 had a final determination of fraud, and 1 had a final determination of Technical Violation.

    - Site visits established that the reported business location was non-existent, there was no evidence of daily business activity, the business location was unable to support the number of employees claimed, or there was no evidence that the employer ever intended for the beneficiary to fill the actual job offered.

5. **Job duties significantly different from position description listed on the LCA/I-129 petition (6 out of the 51 cases with a technical violation or abuse, which is 12% of the overall violations)**

    ✓ Out of these 6 cases, 5 had a final determination of fraud, and 1 had a final determination of Technical Violation.

    - Site visits revealed that the beneficiary was performing job duties that were not consistent with the position description provided by the petitioner.

6. **Already Under ICE Investigation (6 out of the 51 cases with a technical violation or abuse, which is 12% of the overall violations)**

    ✓ Out of these 6 cases, all 6 cases had a final determination of fraud.

    - For BFCA cases under current ICE investigations, ICE requested that FDNS not contact the petitioner and/or beneficiary due to the sensitivity of the investigation. Additionally, due to current resource limitations, ICE more often accepts large-scale fraud cases that carry a greater likelihood of being accepted for prosecution. If a case is under ICE investigation, it is because a significant

amount of articulated fraud exists. Therefore, these cases were categorized as being fraudulent for BFCA purposes.

7. **Misrepresentation of H-1B Status (3 out of the 51 cases with a technical violation or abuse, which is 6% of the overall violations)**

    ✓ Out of these 3 cases, all 3 had a final determination of fraud.

    - Beneficiaries misrepresented their H-1B status by reentering the U.S. as H-1Bs after they had quit or were terminated from their authorized jobs.

    - The beneficiary ported (i.e., transferred to a new employer) under the provisions of AC21 to work for a new H-1B employer. However, the beneficiary started work with the prospective (new) employer before that employer had even filed the I-129 petition.

8. **The beneficiary paid the ACWIA filing fee associated with the H-1B petition process (3 out of the 51 cases with a technical violation or abuse, which is 6% of the overall violations)**

    ✓ Out of these 3 cases, 2 had a final determination of fraud, and 1 had a final determination of Technical Violation.

    - Information obtained during the course of the site visit established that the beneficiary paid the ACWIA filing fee, which the Act and regulations prohibit.

**FRAUD DISCOVERY METHODS:**

1. **80%** of the fraud or technical violation(s) were uncovered during a site visit.
2. **12%** of the fraud or technical violations(s) were uncovered because the case was under current ICE investigation.
3. **8%** of the fraud or technical violation(s) were uncovered by overseas verifications and through file and database reviews.

These percentages illustrate the value of performing a site visit to detect fraud and or technical violation(s) within the H-1B nonimmigrant visa program.

**VALIDITY OF CHARTS AND GRAPHS**

The overall percentage of fraud or technical violation(s) (21%) for the BFCA is an unbiased estimate based upon a random selection from the total number of receipted cases. The charts below represent possible fraud indicators based upon an analysis of traits common among the cases of proven fraud or technical violations. For brevity, the term "violation" refers collectively to both categories of Fraud or Technical Violation(s).

Statistical tests were conducted on various fraud indicators, and it is indicated below where statistically significant differences were found among traits as a result of applying

"Contingency Table" tests based on the Chi-Square probability distribution[10]. These fraud indicators can be used as a reference for creating an anti-fraud strategy.

## BENEFICIARY DEMOGRAPHICS

- Education Level

    o 43% (106 cases) of the beneficiaries in the BFCA sample population had bachelor's degrees or the equivalent. Among this sample, 31% (33 cases) were associated with some type of fraud or technical violation(s).

    o 57% (140 cases) of the beneficiaries in the BFCA sample population had graduate degrees. Among this sample, 13% (18 cases) were associated with some type of fraud or technical violation(s).

| Beneficiary Education Level | Violation Rate | % of Sample | Total Cases |
|---|---|---|---|
| Bachelor's Degree | 31% | 43% | 106 |
| Graduate Degree | 13% | 57% | 140 |

- Occupation Types[11]

    o Accounting, human resources, business analysts, sales, and advertising occupations encompassed 11% (26 cases) of the sample. Among this sample, 42% (11 cases) were associated with some type of fraud or technical violation(s).

    o These figures indicate that H-1B petitions filed for accounting, human resources, business analysts, sales, and advertising occupations are more likely than other occupational categories to exhibit fraud or technical violation(s). [12]

    o Although the art and managerial occupations had the second and third highest rates of fraud or technical violation(s), the total number of cases in each category was not high enough to be able to support a statistically valid conclusion.

    o The most popular H-1B occupation also experienced the fourth highest rate of fraudulent conduct - computer-related occupations accounted for 42% (104 cases) of the sample. Among this sample, 27% (28 cases) were associated with some type of fraud or technical violation(s).

---

[10] In probability statistics the Chi-Square distribution is one of the most commonly used theoretical probability distributions in statistical significance tests. A result is called statistically significant if it is unlikely to have occurred by chance

[11] Occupation types were grouped together based on the DOL North American Industry Classification System (NAICS) codes.

[12] Verified via a Chi-Square statistical test. This statement has been found statistically significant at the 95% level.

| Reported Occupations | Violation Rate | % of Sample | Total Cases |
|---|---|---|---|
| Architecture, Engineering, and Surveying | 8% | 15% | 36 |
| Mathematics and Physical Sciences | 0% | 1% | 3 |
| Computer Professionals | 27% | 42% | 104 |
| Life Sciences | 0% | 4% | 11 |
| Social Sciences | 0% | <1% | 1 |
| Medicine and Health | 10% | 4% | 10 |
| Education | 9% | 13% | 33 |
| Law | 0% | <1% | 1 |
| Writing | 0% | <1% | 1 |
| Art | 29% | 3% | 7 |
| Accounting, Human Resources, Sales, Advertising, and Business Analysts | 42% | 11% | 26 |
| Managerial | 33% | 4% | 9 |
| Miscellaneous Professions | 0% | 2% | 4 |

- Country of Birth

    o USCIS looked at country demographics, but a statistically valid rate of fraud could not be established for multiple countries, as no country had a sufficient number of cases in the sample except for India.

    - 46% (114 cases) of the beneficiaries were born in India. Among this sample, 25% (29 cases) were associated with some type of fraud or technical violation(s)[13].

## PETITIONER / EMPLOYER DEMOGRAPHICS

- Year Company Established

    o Firms established from 1995 to 2005 represented 37% (91 cases) of the sample. Among this sample, 40% (36 cases) were associated with some type of fraud or technical violation(s).

---

[13] Verified via a Chi-Square statistical test. This statement has been found statistically significant at the 95% level.

- o Firms established prior to 1995 represented 63% (155 cases) of the sample. Among this sample, 10% (15 cases) were associated with some type of fraud or technical violation(s).

| Year Company Established | | | |
|---|---|---|---|
| | Violation Rate | % of Sample | Total Cases |
| Prior to 1995 | 10% | 63% | 155 |
| 1995 to 2005 | 40% | 37% | 91 |

- Number of Employees

    - o Companies employing 25 or fewer employees represented 23% (56 cases) of the sample. Among this sample, 54% (30 cases) were associated with some type of fraud or technical violation(s).
    - o Companies employing more than 25 employees represented 77% (190 cases) of the sample. Among this sample, 11% (21 cases) were associated with some type of fraud or technical violation(s).

| Number of Employees | | | |
|---|---|---|---|
| | Violation Rate | % of Sample | Total Cases |
| 25 or Less | 54% | 23% | 56 |
| 26 or More | 11% | 77% | 190 |

- Annual Gross Income (AGI)

    - o Companies with an Annual Gross Income of less than $10 million represented 41% (101 cases) of the sample. Among this sample, 41% (41 cases) were associated with some type of fraud or technical violation(s).
    - o Companies with an Annual Gross Income greater than $10 million represented 46% (113 cases) of the sample. Among this sample, 7% (8 cases) were associated with some type of fraud or technical violation(s).

| Petitioner Annual Gross Income | | | |
|---|---|---|---|
| | Violation Rate | % of Sample | Total Cases |
| Less Than $10 Million | 41% | 41% | 101 |
| Greater Than $10 Million | 7% | 46% | 113 |
| Non-Profit | 6% | 13% | 32 |

- Type of Company

    - o Companies engaged in professional, scientific, and technical services (NAICS 54) make up 52% (128 cases) of the sample. Among this sample, 27% (35 cases) were associated with some type of fraud or technical violation(s). This category

includes companies whose work involves computer software engineering/development contracting.

## PRIMARY FRAUD OR TECHNICAL VIOLATION INDICATORS

Application of the Chi-Square test for statistical significance has led to the preliminary identification of several primary fraud or technical violation(s) indicators identified from the cases in the BFCA sample. They are:

1. Firms with 25 or fewer employees have higher rates of fraud or technical violation(s) than larger-sized companies.

2. Firms with an annual gross income of less than $10 million have higher rates of fraud or technical violation(s) than firms with an annual gross income greater than $10 million.

3. Firms in existence less than 10 years (i.e., 1995 and after) have higher incidences of fraud or technical violation(s) than those in existence for more than 10 years (i.e., before 1995).

4. The results indicate that H-1B petitions filed for accounting, human resources, business analysts, sales and advertising occupations are more likely to contain fraud or technical violation(s) than other occupational categories.

5. Beneficiaries with only bachelor's degrees had higher fraud or technical violation(s) rates than did those with graduate degrees.

**CONCLUSION:** Results from this BFCA have established a 21% baseline fraud and technical violation(s) rate for H-1B petitions. Given the significant vulnerability, USCIS is making procedural changes, which will be described in a forthcoming document.