<pre>
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3     RAGHAVENDER MALLANNAGARI,      )   No. 09 C 1352
                                      )
 4                    Plaintiff,      )   Chicago, Illinois
                                      )   February 16, 2010
 5                                    )   1:30 o'clock p.m.
       -vs-                           )
 6                                    )
                                      )
 7     GSS AMERICA, INC., et at.      )
                                      )
 8                    Defendants.     )

 9
                   TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE WAYNE R. ANDERSEN

11     APPEARANCES:

12     For the Plaintiff:      THE LAW OFFICE OF J. BRYAN WOOD
                               542 South Dearborn
13                             Suite 610
                               Chicago Illinois 60605
14                             BY:  MR. JAMES BRYAN WOOD
                                        and
15                             PETERSON BERK & CROSS
                               200 East College Avenue
16                             P.O. Box 2700
                               Appleton, Wisconsin 54912
17                             BY:  MR. MICHAEL F. BROWN

18
       For Defendants GSS      LAW OFFICES OF ANTHONY PINELLI
19     America, Inc. and       53 West Jackson Boulevard
       GSS America Infotech,   Suite 1460
20     Ltd, Akula and          Chicago Illinois 60604
       Associate Systems LLC:  BY:  MR. ANTHONY PINELLI
21                                      and
       For Defendants GSS      WILLIAMS MONTGOMERY & JOHN, LTD.
22     America, Inc. and       233 South Wacker Drive
       GSS America Infotech,   Suite 6100
23     Ltd.:                   Chicago, Illinois 60606
                               BY:  MR. JAMES P. FIEWEGER
24

25
</pre>

```
 1   APPEARANCES:  (Continued)

 2   For Defendants            BLEGEN & GARVEY
     Marepally and             53 West Jackson Boulevard
 3   Yerrasmsetti:             Suite 1437
                               Chicago Illinois 60604
 4                             BY:  MR. PATRICK W. BLEGEN

 5   For Defendants Patel,     MR. PAUL M. BRAYMAN
     Capalby and               53 West Jackson Boulevard
 6   Adlakonda:                Suite 1437
                               Chicago, Illinois 60604
 7

 8   For Defendants            LAW OFFICES OF ELLEN R. DOMPH
     Chalasani and CES USA,    53 West Jackson Boulevard
 9   Inc.:                     Suite 1544
                               Chicago Illinois 60604
10                             BY:  MS. ELLEN R. DOMPH

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:           ROSEMARY SCARPELLI
                               219 South Dearborn
24                             Room 1412
                               Chicago, Illinois
25                             (312)435-5815
```

1    THE COURT:  You are probably wondering why we are

2    having oral argument.  When I heard that Ellen was involved,

3    I thought, what can we do to get her into this court?  So --

4    MS. DOMPH:  I am not saying anything.  I am

5    standing on my pleadings.

6    THE COURT:  That is a challenge.  We will see.

7    Please be seated.  Are we expecting anybody else?

8    MR. PINELLI:  I don't think so.

9    THE COURT:  Okay.  So why don't we go around and

10   state your name for the record and who you represent.

11   MR. WOOD:  Sure.  Bryan Wood for the plaintiff,

12   Mr. Mallannagari.

13   MR. BROWN:  Michael Brown for the plaintiff.

14   MR. FIEWEGER:  Jim Fieweger on behalf of defendant

15   GSS America and GSS Infotech.

16   MR. PINELLI:  Good afternoon, Judge, Anthony

17   Pinelli, P-I-N-E-L-L-I, for GSS America, Inc., GSS Infotech,

18   Mr. Dheeraj Akula and Associate Systems LLC.

19   MR. BLEGEN:  Patrick Blegen for Bhargav Marepally

20   and Ramish Yerrasmsetti.

21   MR. BRAYMAN:  Paul Brayman on behalf of Mr. Patel,

22   Mr. Adlakonda and Mr. Capalby.

23   THE COURT:  Would you want to announce -- we don't

24   want to make her a liar right off the bat, so since she said

25   she would say nothing, do you want to tell the Court that

1    Miss Domph is here and who she represents.  Okay.

2             MS. DOMPH:  Ellen Domph for Tilak Chalasani.

3             THE COURT:  Thank you.

4             Even though it is the defendant's motion, perhaps

5    one of you can take the floor and give me the background on

6    this lawsuit because I want to make sure I understand what

7    you are -- what the basis for what you are doing is.  And

8    then I would like to get a summary of why the defendants

9    believe that much of the lawsuit should not remain.

10            MR. WOOD:  Sure.  Your Honor, would you like me to

11   come to the podium from here?

12            THE COURT:  Sure, sure.  Actually, I had a law

13   clerk, now a long time ago, who kept correcting me for two

14   years.  He said that is a lectern, this is a podium.  So when

15   you mount to get your gold medal, you are mounting the

16   podium.  When you are going to speak, it is the lectern.

17            So fire away.

18            MR. WOOD:  I will take the lectern.  If it is okay,

19   your Honor, we also have a couple of handouts that will,

20   hopefully, be useful to the Court.

21            THE COURT:  Okay.

22            MR. WOOD:  The only -- there is only one change to

23   what has already been filed, but we just thought it would be

24   helpful.

25            THE COURT:  Are they identical?  I mean those are

1  multiple copies of one handout?

2       MR. WOOD:  They are four copies of each handout,

3  correct.

4       THE COURT:  Okay.  Why don't you give one to me.

5  And then Kate O'Loughlin is, of course, with Judge Lindberg,

6  so she has that other case filed against you.  And then Katie

7  Cook is working with me.  There is an employment

8  discrimination.

9       MR. PINELLI:  Judge, that case is settled and

10  dismissed.

11       THE COURT:  Oh, it was?

12       MR. PINELLI:  Yes.

13       THE COURT:  You know, it is a good idea if the

14  Judge is the among the first 50 to find out.

15       MR. PINELLI:  Judge, we advised Judge Lindberg.

16       THE COURT:  Or, in the case of Judge Lindberg, his

17  law clerk.

18       MR. PINELLI:  Judge Lindberg entered the order

19  dismissing the case.

20       THE COURT:  Are you leaving?

21       CLERK O'LOUGHLIN:  I can.

22       THE COURT:  Oh, no one told you.

23       Yeah, sometimes we don't -- you know, our law

24  clerks are the last -- you are welcome to stay.  It is up to

25  you.  So if she stays -- she is really smart, so she might

1   help me.

2           MR. WOOD:  Thank you, your Honor.  Plaintiff is a

3   foreign worker here from India.  He was recruited, promised

4   wages, had his Visa sponsored by GSS America and --

5           THE COURT:  He got an H-1 visa?

6           MR. WOOD:  H-1B visa, correct.

7           THE COURT:  And back in the olden days when I

8   actually helped a couple people get visas, my recollection is

9   is that you had to have a specific job to get that visa.

10          MR. WOOD:  That's --

11          THE COURT:  With a specific employer?

12          MR. WOOD:  That's correct.

13          THE COURT:  Right?

14          So it is not like you can say, I am a super whiz

15  violinist that some symphony in America would want, the

16  Chicago Symphony has to say to the State Department, we can't

17  find anybody like this violinist, so we would like you to

18  give him an H-1 visa, is that correct?

19          MR. WOOD:  That's correct.

20          THE COURT:  And so what you are saying here is that

21  GSS stepped up to the plate and said for your client, we

22  can't find his skills replicated in the American market, we

23  need him for the job we have?

24          MR. WOOD:  That's correct, that is what they said,

25  your Honor.

1        THE COURT: All right. Please proceed.

2        MR. WOOD: As it turned out, that wasn't -- that

3   wasn't true. There was not work available for him as

4   represented on the LCA application. He showed up to GSS

5   America's offices from January to October of 2008 but never

6   received any paychecks or wages during that period of time.

7   It sounds as though your Honor is familiar with the H-1B

8   process, so I won't go over that in too much detail.

9        In addition to the H-1B Visa process, there is a

10  trafficking enforced labor statute which is designed to

11  prevent the -- obtaining work through the abuse of legal

12  process, legal processes like the H-1B visa process.

13       Here we allege that all of the defendants were

14  involved in violations of the tracking -- trafficking and

15  forced labor statutes. And in the Exhibit B that we

16  provided, specific counts as to each defendant.

17       The problems with the abuse of the process, as your

18  Honor is --

19       THE COURT: Do you have magnifying glasses too?

20       MR. WOOD: I do not, but I can provide a bigger

21  copy, if that will assist the Court. We can -- we are happy

22  to blow it up.

23       THE COURT: Okay.

24       MR. WOOD: In addition to that violation, there is

25  also a violation of the trafficking claims for benefiting

1    from the participation in a venture where you know foreign

2    work fraud or violations of abuse of the H-1B process are

3    going on.  That is a specific statutory provision of 18

4    U.S.C. 2, Section 1593A.

5         THE COURT:  Do those statutes give individuals a

6    private cause of action?

7         MR. WOOD:  They do.  Section 1593A specifically

8    identifies the individuals who can be sued and includes --

9    for a civil action and includes in those individuals -- I

10   don't have the exact framework, the statutory language in

11   front of me -- but includes individuals who participate in a

12   -- who receive benefit from a venture, from participation in

13   a venture of where they know or should know violations of

14   forced trafficking and labor laws are going on.

15        That, from plaintiff's perspective, clearly applies

16   to all of the named defendants in this matter because we

17   specifically allege that each of them knew that forced

18   trafficking in labor was -- was taking place.

19        I am going to ask Mr. Brown to go over a summary of

20   the process or the enterprise, basically the fraudulent

21   scheme.  But what is important to note is that even if

22   plaintiffs cannot prove their -- even if plaintiff cannot

23   prove his RICO claim, this forced trafficking and labor

24   statute provides an individual basis for liability for the

25   predicate acts that are identified in Exhibit B.  So even if

1   the Court finds that plaintiff somehow has not sufficiently

2   pled RICO requirements, the -- there is a -- there is a basis

3   for the forced labor and trafficking claims to go forward.

4          Additionally, plaintiff alleges that there was,

5   obviously, an unpaid wages.  We allege there were control of

6   certain defendants that -- controlled by certain individual

7   defendants, not all.  But the chart lays that out.

8          We also allege that there were specific

9   misrepresentations made to plaintiff on behalf of GSS and GSS

10  America which provide the basis of the fraud claims there.

11  There were also knowing misrepresentations on which plaintiff

12  relied, which we identify in our pleadings, which give rise

13  to the basis for the fraud claims against individual

14  defendants beyond GSS and GSS America.

15         But generally speaking, that provides an overview

16  of the claims on which plaintiff --

17         THE COURT:  Now, just so I understand your client's

18  position, when did he come to the United States?

19         MR. WOOD:  Mike.

20         MR. BROWN:  His first day of work was January 8th,

21  2008.

22         THE COURT:  Okay.

23         MR. BROWN:  But he was in the United States prior

24  to that time, I believe, on an old BT, a student-type status.

25         MR. WOOD:  Student visa.

1    THE COURT:  Wait.  It is a she?

2    MR. WOOD:  He.

3    MR. BROWN:  He.

4    THE COURT:  So he stayed here.  He didn't come here

5    as a result of this process?

6    MR. BROWN:  He came here as a result of a different

7    visa, I believe.  I know for a fact that his --

8    THE COURT:  So probably he was here on a student

9    visa.

10    MR. BROWN:  Yes, sir.

11    THE COURT:  Got himself really well-educated,

12    wanted to stay here and work, and apparently got what I will

13    call the H-1 Visa to, what you are saying is in his mind, get

14    the job that GSS had for him, right?

15    MR. WOOD:  Correct.

16    THE COURT:  Okay.  Where is he now?

17    MR. WOOD:  He is here working for another employer.

18    After some difficulty he was able to transfer his visa to a

19    different employer.

20    THE COURT:  So ultimately he found an employer and

21    he is operating under that same H-1 Visa?

22    MR. WOOD:  With a different --

23    THE COURT:  As far as we know.

24    MR. BROWN:  Yes.

25    MR. WOOD:  With a different sponsor, right.

1    THE COURT:  Right.  And for what period of time was
2  he unemployed?
3    MR. WOOD:  He was employed, but not paid by GSS,
4  from January 2008 to October 2008.
5    MR. BROWN:  Yes.
6    MR. WOOD:  I think he retained employment
7  elsewhere.
8    MR. BROWN:  Effective November 1st, 2008.
9    THE COURT:  He has represented -- you could talk,
10  that is fine.
11    MR. BROWN:  Oh.
12    THE COURT:  He has represented in his complaint
13  that he thought he would have a job for how much money again?
14    MR. BROWN:  $60,000.00.
15    THE COURT:  A year?
16    MR. BROWN:  Yes.
17    THE COURT:  So why haven't you just sued for the
18  wages he lost and let it go at that?
19    MR. BROWN:  There are core wage claims that are
20  based on H-1B regulations.  Those core wage claims are
21  restated on that application documentation, as far as I
22  remember -- I had done this a long time ago.  But on that
23  H-1B labor condition application document that goes to the
24  Department of Labor, that restates these core wage
25  obligations.  That form also states if you make a false

1    attestation on this form -- it is right by the signature --

2    then you will have violated 18 U.S.C. 1546, which is an

3    immigration document fraud statute.  That language on the LCA

4    form itself also says that this sort of false attestation and

5    potential violation of 1546 could subject to civil as well as

6    criminal liability.

7          Now, 1546 is --

8          THE COURT:  So wait.  I want to -- maybe you are

9    getting there.  But my question is --

10         MR. BROWN:  Oh.

11         THE COURT:  It would seem to me that what you have

12   alleged is a contract claim where the defendant did not

13   perform under the contract.  They -- he said, I would pay you

14   $60,000.00 a year.  You showed up for work.  He didn't have

15   the job.  And it wasn't until about ten months later or about

16   $50,000.00 of unpaid wages later that he got another job.  So

17   why aren't you just suing for those wages?

18         MR. BROWN:  Well, I agree any underpaid wage claim

19   could involve contract claim under the court's statutory

20   claims, which the wage claim initially -- or a couple wage

21   claims.  However, that -- you know, where I was almost at, as

22   far as that 1546, that statute reference, as far as false

23   attestations on the LCA form, is an explicit predicate act

24   under RICO.

25         So the plaintiff's position is this form, this

1    application form, says here is the penalty, federal

2    immigration statute violated.  RICO law specifically

3    incorporates that statute as a predicate act which subjects a

4    violating party to treble damages, assuming other RICO

5    requirements are met.

6           MR. WOOD:  I think to supplement Mr. Brown's

7    answer, the answer goes beyond that in -- to the extent that

8    there are other claims that -- for which plaintiff can pursue

9    based on the same conduct that -- defendants' same legal

10   conduct that offer him alternative damages.  We, as his

11   attorneys -- I have an obligation to inform him of those

12   claims and pursue them, if they are viable, to maximize his

13   recovery.

14          Putting that point aside, there is also the problem

15   that he saw, when he was there, that this is -- this is a

16   company that routinely abuses this process, that he was not

17   the only person who was brought here under the false -- or

18   who accepted employment under the false promise of being paid

19   wages.  There are -- there were many others like him.  And

20   based on the information he and we have been able to gather,

21   this is -- this is a routine occurrence at that company and

22   there are laws designed to prevent that type of thing from

23   occurring.  Congress has deemed it important.  And we, on his

24   behalf, and he as a private attorney general, want to enforce

25   those laws, not only for himself, but also to make sure that

1    this type of thing doesn't happen.

2            THE COURT:  Okay.  So I am going to turn it over to

3    the defendants in a minute.  But I gather from looking at

4    your complaint that you claim that there is lots of people in

5    this position, in his position, although none of them go

6    named.  So -- so there is no specificity as to what their

7    names might be.  They are not running into court and

8    complaining.  And we do know that if everything you say about

9    the immigration laws is correct, which it seems to me it is,

10   there is an array of regulatory agencies that have the

11   responsibility to make sure people don't do what you are

12   talking about.  Right?

13           MR. WOOD:  Yes.  The Department of Labor

14   specifically has been involved in an investigation of GSS.

15   Mr. Mallannagari is also working with -- or has filed a

16   Department of Labor charge as well.  He has heard, to my

17   knowledge, nothing in response to that Department of Labor

18   charge.  Part of the problem and part of the scheme that he

19   alleges is efforts by defendants to conceal and destroy

20   information that the Department of Labor could have relied on

21   in reaching a -- in reaching a finding.

22           I think that is part of the basis for the other

23   matter before Judge Lindberg, was the knowledge relating to

24   -- to that and is included as a part of Mr. Mallannagari's

25   complaints.

1        The -- yes, there are those alternative enforcement

2   mechanisms.  I think in the -- as I am sure your Honor is

3   aware as a governmental employee, in the current budget

4   situation there is not always resources, even if there is a

5   viable alternative.

6        The --

7        THE COURT:  Okay.  Let's hear why the defendant --

8   let's hear from the defendants.

9        MR. BROWN:  Your Honor, could I have one point that

10  I think is important?

11       THE COURT:  Sure.

12       MR. BROWN:  You mentioned that no other workers

13  were named, but in fact we did name another worker named

14  Apoorva Siddaramaiah.  He was also, per his allegation and

15  per -- I should say the complaint's allegation -- underpaid.

16  He in his case filed a Department of Labor complaint in

17  January of 2009.  And there was a separate Department of

18  Labor complaint.  While we did not know the identity of that

19  -- that third employee for whom the complaint was filed,

20  Department of Labor complaint allowed the claimants, at least

21  for a time, to remain anonymous.  So -- as well as the

22  plaintiff's own observations of the workers in the office.

23       But you are correct, there is not a laundry list of

24  names, but there are other persons or claims identified.

25       THE COURT:  I was just a little surprised that if

1  your guy was showing up for 30 weeks trying to find a job,

2  making calls, and there were lots of other people that --

3  between those calls, which were unfruitful, that he wasn't

4  saying hello to his neighbors and having lunch with them and

5  getting to know their situation.  So that is --

6           MR. BROWN:  They are scared to come.  I am sorry.

7           MR. WOOD:  Right.

8           MR. BROWN:  They are scared.

9           MR. WOOD:  Respectfully, your Honor, we are aware

10  of names of other people who Mr. Mallanngari can confirm.  He

11  asked us not to put their names in the complaint because of

12  fears of retaliation and reprisal against them as they try to

13  transition from the situation Mr. Mallanngari found himself

14  to a different situation, as well as the overall problem of

15  the individual's ability to be in this country being tied to

16  the sponsor of the H-1B visa.

17           That said, he has not authorized us to pursue the

18  case as a class or a collective action.  It is an option we

19  continue discussing with him.  At that point we would,

20  obviously, have to make an amendment and provide the names

21  that your Honor says are lacking in the complaint.  But we

22  don't want you to believe there aren't individuals out there.

23           I think in Judge Lindberg's there was a pleading

24  that identified an e-mail that included a list of names of

25  individuals for whom checks were being withheld.  So it is a

1   part of the public record at least that there are lots of

2   other individuals who are being affected by this.

3   THE COURT:  Okay.  Thanks.  Who wants to urge me to

4   dismiss the case and why?

5   MR. FIEWEGER:  Your Honor, we haven't really agreed

6   on any division of the arguments or what have you, and I am

7   not inclined to step on anyone's toes or argue on behalf of

8   anybody else.  But on behalf of GSS America and GSS America

9   Infotech, just for ease of reference, I refer to GSS America

10  as just GSS.

11  THE COURT:  Okay.

12  MR. FIEWEGER:  GSS America Infotech as GSS

13  Infotech.

14  GSS America is the company that offered Mr.

15  Mallanngari a position of employment, hired him, retained

16  him, brought him to to the Chicago area, housed him.  GSS

17  Infotech is a company based in India with offices only in

18  India.  And when we look at the complaint, I think it is

19  important to keep those distinctions in mind, not just for

20  GSS and GSS Infotech but for all of these defendants because

21  what has happened here, your Honor, really is they filed a

22  complaint alleging RICO.

23  And you asked them earlier, why didn't you just

24  file a wage claim action?  And they danced around a little

25  bit, but at one point Mr. Wood said, well, there is treble

1   damages under RICO.  This is why they filed a RICO action,

2   your Honor.  This isn't a RICO case.

3           They filed their first -- their first complaint.

4   The complaint got dismissed because they couldn't plead --

5   they couldn't allege an entity.  All they did was charge GSS

6   as being the association that was carrying out the alleged

7   RICO activity.  So they were -- okay.  They learned now we

8   have got to broaden it beyond -- it has got to be somebody

9   besides GSS.  So what did they do?  They added GSS, GSS

10  Infotech and a bunch of -- kind of what I think of as

11  periphery defendants who are primarily either employees of

12  GSS or some sorts of consultants that were hired by GSS to

13  help them in their business in various respects.

14          When you look at just GSS and its employees, you

15  are dealing with the same problem as what they had in the

16  first complaint.  It is just GSS, and that is not a RICO

17  enterprise.  So what they did was they added on these

18  accountants, consultants, you know, IT people, people who

19  allegedly participated in this scheme but really didn't have

20  any role, even according to their allegations, had no role in

21  managing or directing the scheme.

22          And as a result they are  -- they are legally --

23  they should be dismissed.  They are -- they are nonentities

24  for RICO purposes.  They are not -- if they are not managing

25  or directing, they can't be a RICO defendant.  They are not a

1    part of the association.  So once you throw out these

2    parties, these kind of hangers on that aren't managing or

3    directing, you are back to GSS America and its employees.

4           Now, they add -- they make these claims against GSS

5    Infotech about how it supposedly directed this conduct and

6    knew about it and benefited from it.  Judge, I mean this is

7    their amended complaint.  I don't know how many pages, how

8    many paragraphs.  You read this, you won't know who a single

9    officer, director or employee of GSS Infotech is, with the

10   exception of one individual.  I think it is in

11   Paragraph 76 -- 76A -- they say a gentleman named Mr. Raju

12   who resides in India and is an employee of Defendant GSS and

13   that Defendant GSS India e-mailed plaintiff and indicated he

14   had reviewed plaintiff's resumes and provided plaintiff

15   suggestions to get a work project for a third-party employer.

16   That is it.  That is the only specific communication or

17   individual regarding GSS Infotech that is in this complaint.

18          And now they are supposed to be dragged across the

19   ocean to answer a RICO complaint because they knew about

20   something, they directed something, they benefited from

21   something.  You know, if we are going to drag them in, let's

22   hear who it is, who did what, when, how.  You know, and they

23   have had an opportunity to do this and it is not here, your

24   Honor.

25          And what is here is a bunch of mumbo jumbo about

1 | other individuals that were working with GSS that had nothing

2 | to do with RICO. So, your Honor, the RICO claim is just --

3 | it is fanciful. To be honest with you, I -- I agree with

4 | you, this is an action about claim for past wages. Mr.

5 | Mallanngari claims that he showed up and reported for work

6 | and wasn't --

7 |     THE COURT: If we -- if we were to grant your

8 | motions to dismiss, what would be left of the lawsuit?

9 |     MR. FIEWEGER: I think the claims against -- I

10 | think that the wage loss claims against GSS America.

11 |     THE COURT: What is your position on that?

12 |     MR. FIEWEGER: I think that the -- they can state a

13 | claim against GSS.

14 |     THE COURT: Is it -- do you think that -- does your

15 | client owe him the money, do you think?

16 |     MR. FIEWEGER: I don't know. To be honest with

17 | you, I don't know. My client -- there is going to be serious

18 | factual issues in this case, your Honor. They stood up there

19 | and said he reported to work for ten months. I will be

20 | shocked if that is what the record shows. I mean we will see

21 | what happens, but talking to my clients --

22 |     THE COURT: Did he show up to work for ten minutes?

23 |     MR. FIEWEGER: For ten months.

24 |     THE COURT: Ten months, rather.

25 |     MR. WOOD: Yes. Not every day, as every person

1  takes a sick day on occasions, you know.

2  MR. FIEWEGER:  Well, I mean we will try and track

3  down --

4  THE COURT:  I am just --

5  MR. FIEWEGER:  We will try and track these issues

6  down.

7  THE COURT:  I just trying to imagine how we want

8  you to evidence the shock if you find out.  Well, maybe your

9  hair turn white or jump up and down or something.

10  Okay.  So what elements do you believe they have to

11  show to maintain a RICO action that they have failed to

12  allege?

13  MR. FIEWEGER:  I feel I think that they have failed

14  to allege an association.  I think they have failed to allege

15  an adequate time span.  I mean they get to six years, or

16  whatever, by referring back to all of these hundreds of other

17  H-1B applicants for whom, your Honor, you pointed out, nobody

18  is complaining.  We haven't heard from the Department of

19  Labor about any of those.  None -- none of them are coming

20  forward to join this lawsuit.

21  I mean we represented that they are concerned about

22  retaliation against other potential plaintiffs.  Your Honor,

23  unfortunately, with the -- with the economic circumstances

24  GSS has been hit hard, and I believe many of the consultants

25  who were working with them at the time Mr. Mallanngari was

1  aren't working there anymore.  They don't have -- they don't

2  have the business.  So this alleged concern about retaliation

3  from their current employer, my suspicion is for many of them

4  it doesn't exist because the company has had to downsize.

5              THE COURT:  What is GSS' business?

6              MR. FIEWEGER:  They do computer consulting.  They

7  go into companies and design software applications for them.

8  They are third-party computer --

9              THE COURT:  You want me to dismiss the RICO claims.

10  Any other claims?

11              MR. FIEWEGER:  I think everything should be

12  dismissed other than the wage loss claims against GSS.

13              THE COURT:  And those, you acknowledge, are federal

14  claims?

15              MR. FIEWEGER:  The Fair Labor Standards Act.  I

16  think the other two are duplicative.

17              THE COURT:  Did you answer that?

18              MR. FIEWEGER:  No.

19              MR. PINELLI:  Judge, I am sorry, the original

20  complaint I moved to dismiss the RICO and the slave trade.  I

21  answered on behalf of GSS on the Fair Labor Standards claim.

22  We denied liability.  We believe there is a tribal issue as

23  to whether or not anything is owed.  We did answer that.  We

24  got the amended complaint.  I haven't answered that, but I

25  assume I am going to if you allow that claim to stand.

1    MR. FIEWEGER:  On the motions on wage loss claims,

2    we have moved to dismiss -- what is it -- four and five as to

3    duplicative of three.

4    MR. PINELLI:  We moved to dismiss the Illinois wage

5    claims under the Illinois Wage Payment and Collection Act,

6    not the Fair Labor Standards Act claims.  They are not going

7    to get paid twice.  It is harder to get attorney's fees under

8    the Illinois Wage Payment.

9    MR. FIEWEGER:  Mr. Pinelli is doing them a favor.

10    MR. PINELLI:  That was our position.

11    And if I might just add one other thing from the

12    original briefing.  Judge, I know we have talked about some

13    things that I am not sure are in the complaint.  In the

14    complaint the entire allegation with respect to that second

15    slave trade count is Paragraphs 19 and 20.  Plaintiff made

16    himself to start work on an H-1B visa on or about

17    January 8th, 2008.  When plaintiff reported to work, he

18    learned that the programmer analyst position defendants

19    referenced in the letter, an offer letter, did not exist.

20    Defendants did not have a job for him."

21    There is no allegation in this case that anybody

22    traveled to the United States.  I looked at every case I

23    could find -- and there aren't many under that peonage and

24    slave trade -- but there are convictions under criminal law

25    in the Southern District of New York where people had

1    domestic folks at their home who had a visa -- they took

2    their papers -- who could not leave.  They weren't paid.

3    They could not prove they were legally in America.  This was

4    considered criminal conduct.  There is -- nothing even

5    approaching that has been alleged.  So, respectfully, I do

6    think we have a wage dispute here, but RICO and slave trade I

7    believe are quite a reach beyond this complaint.

8         THE COURT:  And do you -- and what you are also

9    contending is is that the -- the other named defendants,

10   whatever -- they have nothing to do with any of this and that

11   that is a frivolous thing to name them?

12        MR. PINELLI:  Judge, they did not have any

13   direction or control over GSS.  My two clients, Mr. Akula and

14   ASL, were consultants brought in to help organize documents

15   during the Department of Labor audit that went on for a

16   couple of months.  They as outside individuals -- under the

17   test like in the United States versus Warneke, they are

18   outside individuals.  They are not involved in the direct

19   operation or control of the enterprise itself.  If there is

20   -- there was no bribery allegation, which is the only way for

21   an outsider to perhaps be involved.

22        So for those individuals, I believe, respectfully,

23   there just isn't enough to hold them on RICO.  On the slave

24   trade, they are in there, but there are no fact allegations

25   about them.

1  THE COURT:  Is that true -- not to speak for all of

2  you, but is that true of the other defendants as well?

3  MS. DOMPH:  It is all --

4  THE COURT:  They are all really independent

5  consultants, they are not officers, directors of GSS?

6  MR. PINELLI:  A couple of individuals are, Judge,

7  and -- but, I would like Mr. Blegen, Mr. Brayman --

8  THE COURT:  Okay.

9  MS. DOMPH:  Just to Mr. Tilak Chalasani, he was a

10  consultant just like Mr. Akula.

11  THE COURT:  That is your client?

12  MS. DOMPH:  Yes, my client.  So he was a consultant

13  during eight weeks of an audit.  And what is interesting

14  about his situation is he worked for CES USA.  They are a

15  named defendant and they have been dismissed out.  And he was

16  hired through them, is my understanding -- hired through

17  them.

18  THE COURT:  Hired through?

19  MS. DOMPH:  CES, who has been dismissed out, I am

20  assuming because -- I am not informed why, but I am assuming

21  because they couldn't state a claim against them.  And there

22  has been no allegations that he worked outside of the scope

23  of that employment for CES.  CES has been dismissed out.  So

24  I would adopt Mr. Pinelli's argument regarding Mr. Akula and

25  direct your attention to that issue.

1    THE COURT:  Mr. Brayman, what about your client?

2    MR. BRAYMAN:  Judge, two of them are directors of

3  GSS and one was inhouse counsel.  You can see the summaries

4  kind of in the amended complaint.  And those three people,

5  Miss Patel was an employee, as was Mr. Adlakonda.  So is

6  Mr. Capalby.  He was the -- the inhouse counsel.  And all

7  they do is in their complaint just summarize their positions,

8  you know, with a company, without making any allegations what

9  they ever did to --

10    THE COURT:  Merit the status of being a defendant?

11    MR. BRAYMAN:  Yes, right.  It is just throwing in

12  employees, you know, as individual defendants with really no

13  factual allegation as to why they should be held responsible.

14    THE COURT:  Okay.  Patrick.

15    MR. BLEGEN:  Judge --

16    THE COURT:  Thank you.

17    MR. BLEGEN:  Similarly my clients, Mr. Marepally

18  and Mr. Yerrasmsetti -- you don't want to hear what Mr.

19  Fieweger said.  What he said is right.  The complaint doesn't

20  make allegations.

21    THE COURT:  What is their relationship to the --

22    MR. BLEGEN:  CEO, Marepally and Yerrasmsetti COO.

23    As far as RICO, they allege what I call in the

24  pleadings a nebulous RICO enterprise which is this loose

25  group of people.  I think, as Mr. Fieweger said, the RICO has

1   to go out.

2          Illinois Minimum Wage Payment Act and FSLA are

3   concerned for individual people like Marepally and

4   Yerrasmsetti.  And this also covers some of Mr. Brayman's

5   clients, Capalby and Patel and Adlakonda.  They haven't

6   sufficiently alleged they meet the requirements of being

7   employer.  They sued GSS as the employer that -- that is who

8   I assume they are interested getting their money back from.

9          But these individual people, they haven't alleged

10  enough to -- so that they are either -- for purposes of the

11  Illinois Wage Payment Act that they knowingly permitted the

12  guy to go underpaid.  And they haven't alleged enough under

13  the -- Illinois Minimum Wage Law or of FLSA.  They haven't

14  sufficiently alleged that they had supervisor authority --

15  supervisory authority over the plaintiff and had partial

16  responsibility for the alleged violation.

17         When you make those kind of claims in your

18  pleading -- they cited today a paragraph of the complaint,

19  Paragraph 84, which in my view is so -- I can't even -- I

20  honestly don't even understand what they are saying in the

21  paragraph.  It pretty much boils down to saying that had GSS

22  directed itself not to pay the plaintiff, but it also says

23  that those things were done under the knowingly directive,

24  and then they pretty much throw everybody up against the

25  wall.

1          I don't think that is enough, even under the

2     relatively loose pleading requirements, to hold individual

3     people like Yerrasmsetti, Marepally, Patel, Capalby --

4     especially the lawyer, had nothing to do with the operations

5     of even GSS and nothing to do with payment.  They don't have

6     enough to hold them individually liable for the failure to

7     pay the alleged failure to pay the wages.

8          THE COURT:  Do you want to make any response to any

9     of that?

10          MR. BROWN:  We do.

11          MR. WOOD:  We do, your Honor, we would like to

12     respond to a few points.

13          THE COURT:  Okay.

14          MR. WOOD:  First of all, with respect to the RICO

15     claims --

16          THE COURT:  And you are welcome to stay there.

17          No, you could sit down.

18          MR. BROWN:  Oh.  I am confused about GSS Infotech

19     who we call GSS India.  They are based in India.  In the

20     complaint -- they are referenced many times in the amended

21     complaint.  And this Exhibit B chart lists all sorts of

22     paragraphs and -- in the amended complaint, but they are

23     referenced both in terms of factual allegations, also in

24     terms of legal violations and specific predicate acts.  So

25     the reference to there being one reference to GSS Infotech I

1    don't understand.

2         MR. FIEWEGER:  Your Honor, it was my client.  Can I
3    just clarify what I meant by that?

4         THE COURT:  Sure.

5         MR. FIEWEGER:  There is all kinds of references GSS
6    Infotech knew about this, GSS Infotech directed that, but
7    they are -- who -- who at GSS Infotech did anything?  When?
8    When did they do it?  How did they do it?  Did they write a
9    letter?  Did somebody tell the COO?  You can say GSS Infotech
10   did this, did that, did the other thing, but there are no
11   specifics at all.

12        It is like I was -- it occurred to me the other day
13   I don't -- re-reading this amended complaint, I don't know
14   anybody who was at GSS Infotech, so I read through -- the
15   only person ever even mentioned from GSS Infotech is this one
16   employee who looked at a resume.  Everything is directed
17   that with no specificity.

18        THE COURT:  Okay.

19        MR. BROWN:  Your Honor, the definition of a RICO
20   enterprise includes explicitly a person or an entity or a
21   corporation.  So that is basically an argument that the
22   statutory definition is incorrect somehow.  But it is an
23   entity.  It is perfectly fine to specify an organization just
24   like individuals.  We have a chart here of all sorts of
25   individuals who are listed in detail.  Their names, both in

1  terms of persons and entities, organizational entities,

2  parent, subsidiary, individual actors, defendants,

3  nondefendants and we telex actually what they -- it is

4  summarized in here exactly what they did, but we state

5  exactly which paragraphs within the amended complaint specify

6  the facts as to exactly what they did and when they did it

7  and how they did it and their names and the places they were

8  at and who they are acting on behalf of and who they were

9  directing and who were they were being directed by.  It is

10  all in --

11           The main thing I am hearing from the defense in

12  terms of argument, let's not read the complaint, 60-page

13  document.  And it wasn't fun drafting.  But in terms of an

14  enterprise, the recent Supreme Court case of Boyle defined

15  enterprise more in terms of its functionality than splitting

16  apart each individual actor and what their particular roles

17  -- their roles are important -- but even more important what

18  general purpose they serve in acting and doing what they did.

19           Here it is easy.  The purpose is is to run a body

20  shop, which is a temp service, which is illegal under H1-B

21  law.  Under H1-B law you can run a temp service.  You can

22  send a person from Oracle to IBM from project to project.

23  When an employer does that and parties do that under -- for

24  RICO purposes, that person has to be paid in between those

25  projects for bench time.  When GSS America and the named

1  defendants, who are Defendant Patel, Defendant Capalby,

2  Defendant GSS India, all -- Defendant Marepally, Defendant

3  Yerrasmsetti, these are all people specifically identified

4  to have knowledge of a falsified LCA document that was

5  submitted to the United States Government saying we are going

6  to pay this guy $60,000.00 a year, and they knew they

7  weren't.

8      Your Honor, we could also comment on the

9  relationship between GSS India -- or what we call GSS India

10  -- GSS Infotech and what defendants call GSS.  We did not

11  specifically allege facts from which the Court could decide

12  to pierce the corporate veil because we believe there is an

13  independent basis for liability for each of the individuals

14  as well as the two defendants GSS India and GSS.

15      Miss Pinto did allege facts which form a basis to

16  pierce the corporate veil.  And Judge Lindberg in a motion to

17  dismiss, which I have a copy of the decision -- I imagine his

18  clerk could provide for you as well -- determined those facts

19  as pled, if true, would provide a basis for piercing the

20  corporate veil.

21      There is clearly a close relationship between the

22  two organizations and a sharing of many functions.  And I

23  understand and apologize for the fact that we are well beyond

24  the pleadings.  But I feel as though we -- we shouldn't place

25  form over substance with respect to what we know to be true

1   versus what may or may not have been exactly listed in the

2   complaint.  Given the opportunity, we can plead facts that

3   would support piercing the corporate veil based on what we

4   now know from Miss Pinto and information that she has

5   provided.  We chose not to do that because we believe that

6   each entity is independently responsible, that we have

7   alleged facts which are like that.

8           Finally, with respect to Mr. Chalasani, I -- Miss

9   Domph must have forgotten or I must have forgotten to provide

10  a copy of the statement, sworn statement, from her client

11  provided by -- to me by the former counsel for CES that

12  clearly demonstrates that Mr. Chalasani never informed CES of

13  anything that he was doing for GSS.  That was the basis for

14  the dismissal of that defendant.  It certainly doesn't

15  provide a basis for the dismissal of Mr. Chalasani based on

16  his own statement, which, again, we have and can provide.

17          Again that is going outside the pleadings, which we

18  are not entitled to do at this point, I understand, but I

19  don't want your Honor to get the impression from defense

20  counsel's arguments that just because facts do not happen to

21  appear in the complaint, that that doesn't mean that they are

22  not true or that we now know that they are true.

23          Finally, Mr. Pinelli mentioned that the only thing

24  that can provide a basis for liability under the forced

25  trafficking laws was withholding documentation of the -- that

1    authorized an individual to be here in the country.  We now

2    know through the sworn statement from a former defendant that

3    was taking place with respect to some individuals.  It was

4    not taking place with respect to the plaintiff, but it was

5    taking place with respect to other workers here on H-1B

6    visas.

7                    THE COURT:  What was taking place?

8                    MR. WOOD:  That they were withholding

9    authorizations that -- they were basically withholding the

10   visa form work that showed that the individuals were in the

11   country, that they were -- that the visa has been approved,

12   that they had been granted visa status, that the company was

13   withholding that documentation and not sending it out to the

14   individual.

15                   From our perspective as what happened with respect

16   to Mr. Mallanngari, the same thing effectively was occurring

17   here.  He was not being provided pay stubs.  He needed those

18   pay stubs to try to transfer his employment, which he -- once

19   he realized there wasn't a position, that he knew he needed

20   to go elsewhere to find income.  So not having the pay stubs

21   made it far, far, far more difficult for him to be able to

22   transfer a visa and find another sponsor.  So from my

23   perspective, there is little difference between actually

24   keeping the visa paperwork that says you are authorized to be

25   here or keeping the pay stubs that an employee like Mr.

1    Mallanngari can use to transfer.

2        Some of the arguments that defendants raise as to

3    deficiencies in the pleadings we can't dispute. What we do

4    know is that we -- or what we do believe is that based on the

5    standards that the Court must apply at this stage, we have

6    alleged sufficient facts to move forward on the claims on

7    which we are continuing to try to move forward on. We

8    voluntarily dismissed claims when we thought there was no

9    basis the wage claims -- the fact that -- the fact that --

10    the fact that the defendants characterized the state wage law

11    claims as redundant ignores a broad variety of federal

12    issues.

13        And, you know, I believe in the Illinois

14    Legislature's right to make another law that would also hold

15    defendants accountable as well as the FLSA law with respect

16    to certain individual defendants -- that the individual

17    defendants on which we are pursuing those claims, we believe

18    we have alleged facts and explained facts on which those

19    individual defendants should be held individually

20    responsible.

21        THE COURT: Let me just take a brief break to

22    consult with all the brains here. And then if I have

23    additional questions, I will let you know when I come back.

24    Okay?

25        Thanks for being here.

1    (Brief pause.)

2         THE COURT:  Okay.  Please be seated.

3         Okay.  Here is what we think we should do:  "We"

4    meaning you:  I think that I should -- I should grant you

5    leave to file another amended complaint.  In that complaint I

6    think you should restrict yourself to what relief your client

7    wants for himself and what facts he has of his own knowledge

8    to support that relief.

9         Now, I know that the whole area of fraud and the

10   Federal Rules gets to be a bit of a Catch 22 because

11   sometimes you don't know what you don't know, but it seems to

12   me that rather than name lots of people who might have

13   undefined ways of being involved as co-defendants -- and I am

14   not a Rule 11 sanction guy, so very rarely do I -- I grant

15   Rule 11 sanctions, but I do believe if somebody has been

16   named as party in a lawsuit, has to hire lawyers to get out

17   of that lawsuit, then unless the person making the

18   allegations against them personally has a factual basis for

19   making those allegations, at the very least they should get

20   their attorney's fees paid to get out of it.

21        So my suggestion is that you file a second amended

22   complaint in which you allege what your client want -- wants,

23   what -- only what he personally knows rather than general

24   allegations about Judge Lindberg's lawsuit or things that you

25   have heard the Department of Labor is doing, et cetera, et

1  cetera.

2  And, obviously, during the course of discovery on

3  that -- because we would be at issue on that -- additional

4  facts may come out that would give you a substantial basis

5  for having a RICO claim or adding other individual defendants

6  who might have been really controlling GSS indirectly or

7  directly.  Then that would be appropriate then.  But given

8  pleading standards of the Federal Rules, I don't think that

9  your client has alleged enough firsthand knowledge here to

10  move forward without me dismissing a number of those claims.

11  I also -- on the duplicative claim of the state

12  action, I think you are perfectly entitled to allege a State

13  action as well and the time -- you know, actually I have had

14  a bunch of lawsuits like that.  No one is going to double

15  collect.  There is likely to be two modestly different

16  theories of collection.  And it really makes jury

17  instructions exciting, if it ever went that far, to try to

18  avoid double collection.  But I have been in that position

19  before.  I have stumbled and made a lot of mistakes, but I

20  haven't made that mistake on a wage claim sort of matter

21  again.  So I think that that is a valid thing to do.

22  So it is up to you.  If you want me to decide this

23  motion to dismiss as it sits there, I am likely to do it, but

24  I am also likely to not have seen information in this

25  complaint which I think adds a number of these defendants on

1     good faith basis.  Obviously, we are here because if GSS was

2     in the process of systematically doing this to lots of people

3     -- and I noticed they are not flooding the courtroom -- one

4     suspects that some of them got American jobs and they are

5     very happy and so maybe they weren't injured.  Maybe they

6     were actually helped in some nice, human way, if extra-legal

7     way.  But if you -- that I wanted to clarify that.

8              But if -- if you want to purr -- to rest on what

9     you have, I will decide the motion to dismiss.  But if I

10    don't find adequate factual basis for every defendant named,

11    I am likely to award that defendant compensation for having

12    to show up and having to defend itself in the absence of

13    specific knowledge on your client's part.  If you want to

14    start with something narrower and in the course of discovery

15    were saying, I know they weren't just a consultant, they were

16    running GSS and telling everyone to do that, and they had a

17    basis for doing it, then that would be a basis for bringing

18    someone in as manager of some kind of conspiracy.

19             What would you like to do?  Do you want to take a

20    final fresh run at this and if facts are unveiled during

21    discovery, you can amend, or do you want to give it a shot

22    where you are now, knowing that I think this is pretty mushy

23    under the federal standards?

24             MR. WOOD:  I guess I am a little confused as to our

25    options, and then would also appreciate some period of time

1     to consult with the client about it because it is his

2     lawsuit, not mine.

3           THE COURT: Your options are to have me decide the

4     motions that are pending now, which look like pretty good

5     motions to me. But it is -- you know, you have got all these

6     pages and all these parties and the chart -- even you

7     required a chart, so -- well, that is fine. Life isn't

8     simple, and I am happy to work my way through it. But based

9     on the review of it I have made and my law clerk has made and

10     the discussions we have had and what you have said today, it

11     doesn't look to me like you have a RICO conspiracy alleged

12     based on knowledge that your client has. You are -- if I am

13     wrong, be happy -- that the -- you are assuming that because

14     there is smoke in a number of other directions, that

15     something is there. And maybe it is. But I didn't write the

16     Federal Rules.

17           And with respect to the individual defendants, if

18     their relationship is not in any kind of controlling way and

19     they are not independent, both, I don't see how they get

20     involved in this lawsuit either as parties -- they might be

21     witnesses and maybe some day you will get enough information

22     to make them a party -- but I don't think they should be

23     dragged into what is essentially a 40 to $50,000.00 wage

24     claim.

25           Also, I was under the impression that your -- your

1  client had been lured from a village in India here, and now I

2  know he was here on a student visa. He wanted to stay. And

3  because other people might have had papers taken away, I

4  heard nothing today that would have stopped him from saying,

5  this isn't what I thought it was, I am going home. And he,

6  apparently, decided not to do that. So I find that a little

7  troubling too.

8          So that is what I -- so you can stand on what you

9  have and I will rule. You might expose yourself to some

10  costs if cases get dismissed. Or you can par it down to what

11  he knows and what you really think you are entitled to. And

12  if during the course of the disputes that defense counsel

13  guarantee us will transpire, other people with other facts

14  want to step forward or facts emerge which make other parties

15  implicate other parties, then you could amend your complaint

16  to do that. I think those are your two basic choices.

17          MR. WOOD: Just to make sure I understand, when you

18  say "facts he knows," do you mean he and his attorneys as

19  agents or do you mean what is personally --

20          THE COURT: He knows. Whoever is signing that

21  complaint has got to know it.

22          MR. WOOD: Right.

23          THE COURT: So it is not we think there is somebody

24  else out there that filed a complaint with the Department of

25  Labor and we think they are worried about the same thing, we

1    think a former employee who said something and is settled

2    knows this.  You shouldn't sign unless you know it to be

3    true, unless you have some factual basis for it.

4              MR. WOOD:  Right.

5              THE COURT:  There is also option No. 3 which

6    lawyers forget, which is settle it.  Make a reasonable

7    demand.  And the defendant shouldn't worry about your demand.

8    You should make -- if you -- there is a certain price for

9    which you would like to get rid of this lawsuit, offer it to

10   the plaintiff and see whether or not they take it.  You know,

11   I -- I think too often defendants are put off by plaintiff's

12   demands.  But if a plaintiff has nothing, putting a little

13   bit of money on the table clarifies that.  And certainly if

14   he were to prevail on any of his theories, his lawyers are

15   going to have a daunting amount of work.  So you guys,

16   hopefully, are going to get paid by the lawyer hour.  But

17   plaintiff's counsel, I am guessing, isn't sending out monthly

18   statements.  But there is going to be a huge amount of work,

19   win, lose or draw.

20             So your main goal to represent your client is get

21   what money you think he should have had for that nine-month

22   period.  If I -- if he were sitting here, I would say, look,

23   why don't you offer X number of dollars and see if -- why

24   don't you demand it and see if they will pay it and get this

25   all over with.

1     But -- so do you want to let us know?  When would

2  you like to report back?

3     MR. WOOD:  We could report back as to which route

4  we would like to pursue in a week or two.

5     THE COURT:  Right.  I would vote for -- today is

6  the 15th.  I would vote for -- how about February 25th?

7     MR. WOOD:  Okay.

8     THE COURT:  That is at 9:00 o'clock.  I will set it

9  on the 9:00 o'clock call.  But since we are all e-mail

10  friends, if you don't want to have -- and not all defendants

11  need to be here.  If we don't hear in advance, if one of you

12  could come, I won't be offended if the others don't come.

13  But you are always welcome.  But if you want to e-mail what

14  you would like to do to us, then we can avoid everyone having

15  to come over here.  And I could respond by e-mail and we

16  could move on with the lawsuit.

17     And -- but if you want me to decide it, that is

18  fine.  I mean if you feel good about the complaint and your

19  defense against the motion to dismiss, that is fine.  I will

20  do my job.  And I don't mean that sarcastically.  It is a lot

21  of work.  And I will go into it with an open mind and open

22  heart.

23     MR. WOOD:  If the plaintiff would choose to amend

24  the complaint, approximately what time would we be given to

25  amend?

1          THE COURT:  Well, you tell me.

2          MR. WOOD:  Okay.

3          THE COURT:  You tell me what time you want.  Say I

4   would like until X to file an amended complaint.

5          MR. WOOD:  Okay.

6          THE COURT:  You know, so I am not -- and I -- you

7   know, we wouldn't be here if I weren't troubled by this

8   apparent way of doing business.  You know, if -- if what you

9   have alleged is true, it is somewhat troubling.  So here we

10  are.

11         Thanks.

12         MR. WOOD:  Thank you for your time, your Honor.

13         MR. FIEWEGER:  Thank you, Judge.

14         THE COURT:  Thank you all for being here.

15     (Which were all the proceedings heard.)

16                    CERTIFICATE

17     I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19

20  s/Rosemary Scarpelli/          Date:  July 16, 2010

21

22

23

24

25